UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUAN ORTIZ, by and through his next friend, Ramon L. Ortiz, et al., | ) 1:11CV1521<br>)<br>)<br>) |
| Plaintiffs | )<br>) |
| v. | ) JUDGE LESLEY WELLS<br>) (Mag. Judge Kenneth S. McHargh)<br>) |
| BRIAN KAZIMER, et al., | )<br>)<br>) |
| Defendants | ) REPORT AND<br>) <u>RECOMMENDATION</u> |

McHARGH, MAG. JUDGE

The plaintiffs, Juan E. Ortiz ("Ortiz") (by and through next friend Ramon L. Ortiz), Ramon L. Ortiz, and Alma I. Perez, have filed suit against defendants Brian Kazimer ("Kazimer") and Dan F. Crisan ("Crisan"), both Cleveland Police Officers (collectively, "defendants"), under 42 U.S.C. §§ 1983 and 1985(3).  Ramon L. Ortiz and Alma I. Perez are the parents of Juan E. Ortiz.  The complaint contains ten counts, in brief:

1.  Unreasonable seizure and excessive use of force, against Kazimer;

2.  Failure to intervene and protect Ortiz against Kazimer's unreasonable seizure and excessive use of force, against Crisan;

3.  Intentional infliction of emotional distress, against Kazimer;

4.  Negligent infliction of emotional distress, against Kazimer;

5. Battery (on Ortiz), against Kazimer;

6. False arrest, against Kazimer;

7. Negligence, against Kazimer and Crisan;

8. Civil liability for criminal conduct under Ohio Rev. Code § 2307.60, against Kazimer;

9. Battery (on Perez), against Kazimer; and,

10. Civil liability for criminal conduct under Ohio Rev. Code § 2307.60, on behalf of Ortiz's parents, against Kazimer.

(Doc. 1.)  The defendants have filed a motion for summary judgment (doc. 25), and the plaintiffs have filed a memorandum in opposition (doc. 27).


## I.  SUMMARY JUDGMENT

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  See Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court held that:

> . . . Rule 56(c)[1] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

---

[1] Now Rule 56(a).

2

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The evidence need not be in a

form admissible at trial in order to avoid summary judgment, but Rule 56(e)

requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324.

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir.

1989), has interpreted Celotex and two related cases, Anderson v. Liberty Lobby,

Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith

Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for

summary judgment motions. Street points out that the movant has the initial

burden of showing "the absence of a genuine issue of material fact" as to an

essential element of the non-movant's case. This burden may be met by pointing

out to the court that the respondent, having had sufficient opportunity for

discovery, has no evidence to support an essential element of his or her case.

Street, 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact, but must "present affirmative evidence in

order to defeat a properly supported motion for summary judgment." Id. In ruling

on a motion for summary judgment, the court must construe the evidence, as well

as any inferences to be drawn from it, in the light most favorable to the party

opposing the motion.  Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir. 1990).


## II.  FACTUAL BACKGROUND

The court will construe the evidence in the light most favorable to Ortiz, as the party opposing the motion for summary judgment.

On August 16, 2010, at 4:59 p.m., Cleveland Police received a call from a man reporting that he was robbed by a man who stuck a gun in his back and demanded his wallet, near 14577 Lorain Avenue.  The thief was described as a white man, about 5'8" tall, wearing a hat and a long shirt.  (Doc. 25, RX A, at 1.)  Cleveland Police Officers Kazimer and Crisan responded and interviewed the victim, who indicated that the thief headed under the bridge, and up the hill, near the apartments at West 143rd Street.  (Doc. 25, RX A, at 1.)  At 5:30 p.m., Cleveland Police Dispatch broadcast that Nina Kennedy ("Kennedy"), apartment manager at the West Terrace Apartments, had called in to report that two men had turned in a wallet to her approximately two minutes before.

As the officers approached the West Terrace Apartments, they received partial descriptions of the men who returned the wallet to Ms. Kennedy:  one man, with dirty blonde hair and a mustache, was wearing a blue T-shirt, and the other man was older, in his 50s, clean-shaven with a ball cap, and possibly wearing a red shirt.  (Doc. 25, RX A, at 2; see also doc. 27, PX 1, Kennedy decl., at ¶¶ 4-5.)  The

4

officers asked to have this description repeated, and it was repeated to them a second and third time.  (Doc. 27, memorandum in support, at 2.)  When Officers Kazimer and Crisan turned down West 143rd Street, they saw a person wearing a red shirt and jeans.  The person, later identified as Juan Ortiz, ran away.

Several persons asserted that, before this incident, Ortiz had not been scared of police officers.  (Doc. 27, PX 2, Manzano decl., at ¶ 26; see also doc. 27, PX 1, Kennedy decl., at ¶ 12 (had never observed him to be frightened of law enforcement); doc. 25, DX D, R. Ortiz dep., at 21; doc. 25, DX E, A. Perez dep., at 16.)  Although Malvin Perez stated that Officer Kazimer yelled to Ortiz, Perez believed that his brother [Ortiz] could not hear the policeman because he was listening to the radio with headphones.  (Doc. 27, PX 3, M.Perez decl., at ¶ 4.)  Perez stated, however, that the officer jumped a fence and began chasing Ortiz.  (Doc. 27, PX 3, M.Perez decl., at ¶ 4.)  Nonetheless, the parties do not dispute[2] that, for whatever reason, Ortiz ran.

Ortiz is a Puerto Rican teen with Down syndrome.  At the time of the incident, he was under five-feet tall, weighed a little over 100 pounds, and although he was 16 years old[3], he appeared to be younger, more like 12-13 years old.  (Doc.

---

[2]  Ortiz's mother, Alma Perez, testified that Ortiz was "walking" toward her, as was the police officer, not running (doc. 25, DX E, A. Perez dep., at 30-33, 53-54), but plaintiffs consistently state that Ortiz was running.  See, e.g., doc. 27, at 3-4; doc. 25, DX D, R. Ortiz dep., at 26 ("running").  The court will construe the conflicting facts in favor of plaintiffs as the non-movant.

[3]  Ortiz was born in 1994.  (Doc. 25, DX E, A. Perez dep., at 14.)

27, PX 1, Kennedy decl., at ¶ 3; doc. 27, PX 2, Manzano decl., at ¶ 3; doc. 27, PX 10, Posey decl., at ¶ 8.)  For the most part, Ortiz did not match the description of the suspect that the robbery victim gave when he called 911, namely, a white man, 5'8", wearing a hat and a long shirt.  Nor did Juan match the description that apartment manager Kennedy gave of the two men who turned in a wallet to her, one man, with dirty blonde hair and a mustache, wearing a blue T-shirt, and the other an older man, in his 50s, clean-shaven with a ball cap, although he was possibly wearing a red shirt, as Ortiz was.  In addition, numerous witnesses stated that Ortiz's condition (Down syndrome) is readily apparent.  (Doc. 27, PX 1, Kennedy decl., at ¶ 3; doc. 27, PX 2, Manzano decl., at ¶ 3.)

Officer Kazimer left the car to chase Ortiz on foot, while Officer Crisan pulled the car around to where he suspected the fleeing person would run.  At 5:33 p.m., Officer Crisan radioed[4] that his partner was in foot pursuit of a "black man" in a "red shirt" and "blue shorts."  (Doc. 25, DX A, at 3.)  The following minute, Crisan radioed, "my partner's got him."  Id.

Several persons at the scene attempted to inform the police that Ortiz had Down syndrome.  (Doc. 25, DX D, R. Ortiz dep., at 31 ("several people" were telling Kazimer.))  While Kazimer was chasing Ortiz, the officer ran past Eliezer Manzano, who told Kazimer that Ortiz had Down syndrome.  (Doc. 27, PX 2, Manzano decl., at ¶ 6.)  When Kazimer had caught up to Ortiz, and seized him, Manzano, the father

---

[4]  The accuracy of the police dispatch log (DX A) has not been challenged.

Ramon Ortiz, and Malvin Perez told Kazimer that Ortiz had Down syndrome, and that Ortiz would not understand what he was saying.  (Doc. 27, PX 2, Manzano decl., at ¶¶ 11, 13, 14; doc. 27, PX 3, M.Perez decl., at ¶¶ 6,8, 10; doc. 25, DX D, R. Ortiz dep., at 31, 33.)

When Officer Kazimer caught up to Ortiz, he detained Ortiz by forcibly pinning him to a nearby truck, and then handcuffing him.  (Doc. 27, PX 2, Manzano decl., at ¶ 17.)  In his declaration, Manzano characterized the officer's actions as follows:

> Juan's parents were standing in the parking lot by his mother's vehicle.  Juan ran to his parents and stopped.  He began hugging his mother.  He was hugging his mother when the officer grabbed Juan from behind, forcefully pulled him from his mother's arms, and slammed him very hard into her vehicle like a football player making a tackle.  * * *  . . . Juan was standing still and hugging his elderly mother at the time the officer grabbed him from behind.  The radio Juan had been carrying flew quite a distance away when the officer pulled him from his mother and slammed him into the vehicle.

(Doc. 27, PX 2, Manzano decl., at ¶ 8.)  Ramon Ortiz testified that [Juan] Ortiz had already handed the radio to him (doc. 25, DX D, R. Ortiz dep., at 26), but concurred that the policeman "attacked my son, and he slammed him real hard against the car."  (Doc. 25, DX D, R. Ortiz dep., at 27.)  Malvin Perez stated that Kazimer "tackled Juan and slammed him hard into our mother's truck."  (Doc. 27, PX 3, M.Perez decl., at ¶ 5.)

The mother, Alma Perez, testified to the events as follows, through an interpreter:

7

A.  [Juan Ortiz] walks toward me to give me the radio and to take off these little things that he had on.

Q.  Is it to hear the music out of, the earpiece?

A.  Yes.

Q.  Did he communicate anything to you?

A.  No.

Q.  Did he seem scared?

A.  No.  He came walking, listening to the radio, towards where I was.

* * * * *

A.  Juan is there with me, walking towards me with the radio, and I see the policeman coming, and he jumps over the fence, and I didn't think he was coming towards where we were.

* * * * * *

A.  When he jumped the fence, my little boy is giving his back towards where he's come and he's handing me the radio, and I was startled to see that.  I didn't think he was coming towards us.

Q.  So Juan's back was to the police officer; is that what you said?

A.  Yes.  His back was towards the policeman.

Q.  What did the policeman do?

A.  He walked – he came toward us, this very short distance, and Juan is giving me the radio, and he grabs him from the back of the sweater, and he slams him against the car and handcuffs him.

Q.  Was Juan wearing a red t-shirt that day?

8

A.  It was a red sweater.[5]

Q.  A sweater?

A.  Yeah.  It was a sweater.

Q.  Was it hot that day?

A.  Yes.

Q.  Did you ever hear the police officer say anything before he grabbed Juan?

A.  No.  He was walking.  Then he grabbed him from the sweater, slammed him against the car, put the handcuffs on him, and that's when I began yelling.

Q.  When you say he slammed him against the car, was that your car?

A.  Yes.

Q.  What kind of vehicle, or what kind of car do you have or did you have that day?

A.  Me?

Q.  Yes.

A.  It was a Ford Explorer.

* * * * *

Q.  When you started yelling at the police officer, was there only just the one or were there two police officers at that point?

A.  No.   Just one.

---

[5]  Ms. Perez is speaking Spanish, to an interpreter.  Her husband, in his deposition, also stated at one point that Ortiz was wearing a "sweater."  (Doc. 25, DX D, R.Ortiz dep., at 57:  "A.  For us, a sweater is a t-shirt.  Q.  So a red t-shirt? A. Yes.")

Q.  Do you know where the other police officer was?

A.  After he had put the handcuffs on Juan, that's when the other one arrived in the patrol car.

* * * * *

A.  . . . When he slammed Juan against our car, we had just parked it, so it was hot, and his little cheek was touching the car, and we wanted to put the hand underneath because of the heat, and the officer just pushed us back.

Q.  Who tried to put their hand under Juan's face?

A.  The father.

* * * * * *

Q.  Now, earlier did you say that the officer was running towards you and Juan?

A.  No.  He was not running.

Q.  He was walking?

A.  Walking.

(Doc. 25, DX E, A. Perez dep., at 32-33, 39-40, 41-42, 43, 53-54.)

Ramon Ortiz testified that he told Officer Kazimer that his son was "just a little boy with Down syndrome."  (Doc. 25, DX D, R. Ortiz dep., at 29.)  Kazimer told Ramon Ortiz that he knew what he was doing, and to step aside, and Ramon Ortiz did so.  Id.

According to Manzano, the second officer [Crisan] arrived after Kazimer had handcuffed Ortiz.  (Doc. 27, PX 2, Manzano decl., at ¶ 18.)  The parents, Ramon Ortiz and Alma Perez, also testified at deposition that after Ortiz was in handcuffs,

10

the other police arrived.[6]  (Doc. 25, DX D, R. Ortiz dep., at 31; doc. 25, DX E, A. Perez dep., at 42.)

Witnesses differ in the amount of time that Ortiz was pinned against the vehicle, ranging from 5 minutes to 15 minutes or more.  (Doc. 25, DX D, R. Ortiz dep., at 50 (15 minutes or more); doc. 27, PX 1, Kennedy decl., at ¶ 10 (10-15 min.); doc. 27, PX 2, Manzano decl., at ¶ 21 (5 minutes); doc. 27, PX 3, M.Perez decl., at ¶ 12 (5 min.).)  There is evidence that Ortiz was kept in handcuffs for an additional 10-20 minutes.  (Doc. 27, PX 2, Manzano decl., at ¶ 22 (15-20 min.); doc. 27, PX 3, M.Perez decl., at ¶ 12 (10 min.); see also doc. 25, DX E A.Perez dep., at 46 (15-20 min.).)

The apartment manager Kennedy (the person who had called the police to report that a wallet had been turned in) was a short distance away, saw Ortiz handcuffed and pinned against the vehicle, and yelled out the window that they had the wrong person.  (Doc. 27, PX 1, Kennedy decl., at ¶¶ 6-7.)  As additional police responded to the scene, they spoke with Kennedy, and Ortiz was released from the handcuffs.

At 5:37 p.m., Cleveland Police Dispatch was informed, "ALL OK CALMING DOWN."  (Doc. 25, DX A, at 3.)

_____

[6]  On the other hand, Malvin Perez appears to state that Crisan had arrived prior to Ortiz being handcuffed by Kazimer.  (Doc. 27, PX 3, M.Perez decl., at ¶¶ 9, 11.)

### III.  SECTION 1983 CLAIM

To prove a claim under 42 U.S.C. § 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting under color of state law.  Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994).  The complaint alleges that Officer Kazimer used excessive force to forcibly detain Ortiz without just case, causing him injuries and distress.  (Doc. 1, at ¶¶ 1-2, 52-53.)  The complaint also alleges that Officer Crisan failed to intervene to prevent the attack.  Id. at ¶¶ 3, 56-58.

The defendants move for summary judgment on the basis of qualified immunity.  (Doc. 25, at 5-11.)  In addition, they argue they are entitled to judgment on all claims on the merits.  (Doc. 25, at 11-15.)

### IV.  QUALIFIED IMMUNITY

The issue of qualified immunity must be addressed at the earliest possible point in the litigation.  Pearson v. Callahan, 555 U.S. 223, 232 (2009); Saucier v. Katz, 533 U.S. 194, 200-201 (2001).  The Supreme Court has stated that the inquiry regarding qualified immunity is distinct from the merits of the constitutional claim itself.  Saucier, 533 U.S. at 204; Dunigan v. Noble, 390 F.3d 486, 491 n.5 (6th Cir. 2004).

12

A government official who is performing a discretionary function is entitled to qualified immunity from suit[7] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999).  In other words, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be protected by qualified immunity.  Painter, 185 F.3d at 567.  Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff.  Harlow, 457 U.S. at 815.  Qualified immunity is a purely legal question which must be determined early in the proceedings.  Saucier, 533 U.S. at 200; Siegert v. Gilley, 500 U.S. 226, 232 (1991).

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question.  Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir. 1992).  (The defendants here have met their initial burden:  it is uncontested that the police officer-defendants were acting in their official capacities.)

The burden then shifts to Ortiz.  The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity.

---

[7] Qualified immunity is an immunity from suit, rather than a mere defense to liability.  Pearson, 555 U.S. at 231; Saucier, 533 U.S. at 200; Dunigan, 390 F.3d at 490.

13

Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005); Cartwright v. City of Marine City, 336 F.3d 487, 490-491 (6th Cir. 2003) (citing Rich, 955 F.2d at 1095). Upon the assertion of qualified immunity, the plaintiff must put forward "specific, nonconclusory factual allegations" that would defeat the immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).

The Supreme Court has held that the "two-step sequence" previously required by Saucier v. Katz "should no longer be regarded as mandatory," and that district courts have discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.  The two factors which are relevant to demonstrate whether or not the defendants are entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Pearson, 555 U.S. at 232 (internal citations omitted); see also  Saucier, 533 U.S. at 201.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." Saucier, 533 U.S. at 201.  The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004); Saucier, 533 U.S. at 202.  If the law does not put the officer on notice that his

14

conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Saucier, 533 U.S. at 201.  See also Pearson, 555 U.S. at 232 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules."  Dunigan, 390 F.3d at 491 (citing Saucier, 533 U.S. at 202; Anderson, 483 U.S. at 639).

The complaint alleges both an unreasonable seizure, and an excessive use of force.  The Fourth Amendment guarantees a person the right to be free from "unreasonable searches and seizures."  U.S. Const. Am. IV; United States v. Obasa, 15 F.3d 603, 606 (6th Cir. 1994).  The court will briefly review the law concerning seizures and excessive force.

### A.  Seizures

Although ordinarily a warrant is required, the Supreme Court has recognized three types of permissible warrantless encounters between a citizen and the police:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon 'reasonable suspicion'; and (3) arrests which must be based upon 'probable cause.'

United States v. Williams, No. 10-3907, 2012 WL 1138999, at *3 (6th Cir. Apr. 6, 2012) (quoting United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008)).

15

A police officer may conduct an investigatory ("Terry") stop if he has a reasonable suspicion that a person has been, is, or is about to be engaged in criminal activity.  Robinson v. Howes, 663 F.3d 819, 828 (6th Cir. 2011) (habeas); United States v. Jackson, No. 04-3894, 2006 WL 2042901, at *3 (6th Cir. July 20, 2006).  Under Terry, the officer may detain the person briefly, to investigate the suspicious circumstances, if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Jackson, 2006 WL 2042901, at *3 (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)); Obasa, 15 F.3d at 606.

Police officers must rely on "specific facts . . . tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation." Jackson, 2006 WL 2042901, at *6 (quoting United States v. Hudson, 405 F.3d 425, 438 (6th Cir. 2005)).  Where a person's physical appearance "differed significantly from that of the suspect," the Sixth Circuit has ruled that the person detained "should not have been stopped or should have been released immediately when the officers saw that he did not match the description of the suspect."  Jackson, 2006 WL 2042901, at *6.

The Sixth Circuit has emphasized the limited nature of this type of detention:

> Before Terry no seizures of the person were deemed permissible under the Fourth Amendment absent probable cause.  Terry created a limited exception to this general rule — allowing investigative stops on something less than probable cause where the governmental interest is important and the law enforcement officer is "able to point to specific

16

and articulable facts, which taken together with rational inferences from those facts reasonably warrant that intrusion."

Obasa, 15 F.3d at 606-607 (quoting United States v. Saperstein, 723 F.2d 1221, 1229 (6th Cir. 1983)).  The officer may ask the person questions to ascertain his identity, and to try to obtain information confirming or dispelling the officer's suspicions.  Obasa, 15 F.3d at 607 (quoting Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984)).  Where the officer's actions go beyond investigating the suspicious circumstances which led to the stop, "the detention becomes an arrest which must be supported by probable cause."  Obasa, 15 F.3d at 607 (citing Dunaway v. New York, 442 U.S. 200, 212 (1979)).

Although such an investigative stop must be brief, there is no rigid time limit for a permissible Terry stop.  Obasa, 15 F.3d at 607.  In United States v. Sharpe, the Supreme Court considered "whether an individual reasonably suspected of engaging in criminal activity may be detained for a period of 20 minutes, when the detention is necessary for law enforcement officers to conduct a limited investigation of the suspected criminal activity."  United States v. Sharpe, 470 U.S. 675, 676-677 (1985).  "In holding that the 20-minute detention did not convert a Terry stop into a de facto arrest, the Court found that the police pursued their investigation diligently during the 20 minutes and there was no delay that was unnecessary to a diligent investigation."  Obasa, 15 F.3d at 609 (citing Sharpe, 470 U.S. at 687).

17

An officer's "reasonable suspicion" may be supported by the suspect's nervousness, hurrying away from the police, or other evasive behavior.  Robinson, 663 F.3d at 830 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).  In a case where the suspect flees, the Sixth Circuit has noted the following:

> We have held that if officers have reasonable suspicion that an individual has committed or is committing a crime, and when approached by officers the individual flees or attempts to flee, the reasonable suspicion "ripens" into probable cause.

Williams, 2012 WL 1138999, at *4 (citing United States v. Dotson, 49 F.3d 227, 230-231 (6th Cir. 1995), and other cases).  In Williams, the individual matched the description of the drug dealer, and his flight caused the officers' reasonable suspicion to ripen into probable cause supporting an arrest.  Williams, 2012 WL 1138999, at *4.

The court finds that Ortiz was seized when Officer Kazimer caught up to him.  The officers were justified in undertaking their initial investigatory stop.  The officers had a reasonable suspicion that a person in the vicinity of West Terrace Apartments, wearing a red shirt, who fled upon their approach, might have some connection with the criminal activity that recently occurred nearby.  See, e.g., Williams, 2012 WL 1138999, at *4 (citing Dotson, 49 F.3d at 230-231); Robinson, 663 F.3d at 830 (reasonable suspicion supported by evasive behavior).  At a distance, they clearly did not have a good look at the person, since they characterized him as a black man, based apparently on the rear view of Ortiz running, but Ortiz fled before they got closer.

18

Although there is evidence that Ortiz's Down syndrome is readily apparent (doc. 27, PX 1, Kennedy decl., at ¶ 3; doc. 27, PX 2, Manzano decl., at ¶ 3), that condition alone does not preclude him from being the suspect, although it might have given the officer pause.  More importantly, it should have been clear to the officers shortly after they seized him that Ortiz was not an adult, as the various suspects were described, that Ortiz was under five feet tall, and thus nowhere near the 5'8" height of the robbery suspect (even taking into account the inevitable inaccuracies of physical descriptions under stress), and that he neither had dirty blonde hair and a mustache, nor was he an older man in his 50s, as the two wallet "suspects" were described.  The plaintiffs contend that Ortiz was held long after Kazimer should have realized that Ortiz could not have been one of the actual suspects.  (Doc. 27, at 9-11.)  However, the court does not agree that Ortiz was detained longer than was reasonably necessary.

The plaintiffs present inconsistent evidence as to how long Ortiz was held against the vehicle, and how long he remained in handcuffs.  Plaintiffs present evidence that Ortiz was pinned against the vehicle, for as little as 5 minutes (doc. 27, PX 2, Manzano decl., at ¶ 21 (5 minutes); doc. 27, PX 3, M.Perez decl., at ¶ 12 (5 min.)), or up to 15 minutes or more (doc. 25, DX D, R. Ortiz dep., at 50 (15 minutes or more); doc. 27, PX 1, Kennedy decl., at ¶ 10 (10-15 min.)).  There is also evidence that Ortiz may have been kept in handcuffs for an additional period of time.  The

mother testified that the entire incident lasted 15-20 minutes.  (Doc. 25, DX E, A. Perez dep., at 45-46.)

The plaintiffs do not contest the authenticity of the police dispatch log.[8]  (Doc. 25, DX A; see generally doc. 27.)  According to that log, Crisan reported to dispatch at 5:33 p.m. that his partner was in foot pursuit of a man wearing a red shirt.  (Doc. 25, DX A, at 3.)  At 5:35, it was reported to dispatch that the suspect was apprehended.  Id.  At 5:37 p.m., it was reported that, "ALL OK CALMING DOWN." (Doc. 25, DX A, at 3.)  At least one backup unit was reported on the scene at 5:38 p.m.  (Doc. 25, DX A, at 4.)  At 5:57 p.m., dispatch directed the defendants to another location.  (Doc. 25, DX A, at 4.)

That is consistent with the mother's deposition testimony that after the call for assistance was made, "it didn't take that long," and the back-up unit arrived within five minutes.  (Doc. 25, DX E, A. Perez dep., at 46.)  When officers from the back-up unit arrived, they went and spoke with Kennedy, who confirmed that Ortiz was not one of the men who turned in the wallet.  (Doc. 25, DX E, A. Perez dep., at 43-44.)  At that point, Kazimer took the handcuffs off of Ortiz.  (Doc. 25, DX E, A. Perez dep., at 45.)  The mother testified that "they took the handcuffs off, and they left."  (Doc. 25, DX E, A. Perez dep., at 45.)  Her testimony, essentially, is that Ortiz was forcibly handcuffed, backup arrived in less than five minutes, backup spoke

---

[8]  To the extent that plaintiffs' evidentiary assertions are inconsistent with the factual record of the dispatch log, the court cannot adopt those assertions as fact.  See Scott v. Harris, 550 U.S. 372, 380 (2007).

with Kennedy, which established that Ortiz was not in fact a suspect, and Kazimer removed the handcuffs.  She does not testify to any delays in this string of occurrences.

The father also testified at deposition that the back-up officers arrived and spoke with Kennedy, came out of her office with her, and the handcuffs were then removed from Ortiz.  (Doc. 25, DX D, R. Ortiz dep., at 37-38.)  He was asked whether the officers left "as soon as the handcuffs came off of Juan [Ortiz]?" and he responded, "A little while later."  (Doc. 25, DX D, R. Ortiz dep., at 38.)

The court finds that the facts as provided by the plaintiffs, in view of the circumstances the officers confronted, assessed in light of clearly established legal rules concerning Terry stops, do not carry plaintiffs' burden of proof to show that the defendants are not entitled to qualified immunity concerning the Terry stop.

The officers' stop of Ortiz was reasonable, in view of his red shirt and his flight from the officers.  Given his initial flight, and the presence of several individuals who were attempting to interpose themselves when Kazimer (alone) first apprehended Ortiz, the decision to secure Ortiz with handcuffs was not unreasonable.  The testimony offered by the plaintiffs themselves demonstrates that Ortiz was released from the handcuffs as soon as police officers were able to establish from a neutral party that he was not the man they sought.  The court cannot find that there was an unreasonable delay.  See, e.g., Sharpe, 470 U.S. at 676-677; Obasa, 15 F.3d at 609.

21

B.  Excessive force

Claims that officers used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard.  Brosseau, 543 U.S. at 197; Saucier, 533 U.S. at 204; Graham v. Connor, 490 U.S. 386, 394-395 (1989). Determining whether the officer's actions were objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest."  Graham, 490 U.S. at 396; Cole v. City of Dearborn, No. 10-2392, 2011 WL 5924562, at *3 (6th Cir. Nov. 28, 2011); Russo v. City of Cincinnati, 953 F.2d 1036, 1044 (6th Cir. 1992).  The Supreme Court has recognized that the right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion" to effect it.  Graham, 490 U.S. at 396 (citing Terry, 392 U.S. at 22-27).

The use of force is reviewed from the perspective of a reasonable law enforcement officer at the scene.  Cole, 2011 WL 5924562, at *3 (citing Saucier, 533 U.S. at 209; Graham, 490 U.S. at 396-397).  The analysis must "allow[ ] for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Cole, 2011 WL 5924562, at *3 (quoting Graham, 490 U.S. at 396-397).

22

As a general matter, the right to be free from excessive force by police is a clearly established Fourth Amendment right.  Cole, 2011 WL 5924562, at *4 (citing Neague v. Cynkar, 258 F.3d 504, 507 (6th Cir. 2001)).  The Sixth Circuit has repeatedly held that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."  Cole, 2011 WL 5924562, at *4 (quoting Baker v. City of Hamilton, 471 F.3d 601, 607 (6th Cir. 2006)); see also Wheeler v. City of Cleveland, No. 09-4089, 2011 WL 944374, at *2 (6th Cir. Mar. 21, 2011); Michaels v. City of Vermillion, 539 F.Supp.2d 975, 990 (N.D. Ohio 2008) (citing Shreve v. Jessamine Cty. Fiscal Ct., 453 F.3d 681, 688 (6th Cir. 2006)).  Once a suspect is passively complying with the officer's commands, that suspect has a clearly established right to be free from force (beyond what may be necessary to carry out an arrest).  Cole, 2011 WL 5924562, at *5; see also Wheeler, 2011 WL 944374, at *2; Baker, 471 F.3d at 608.

## 1.  Kazimer

The evidence provided by plaintiffs supports a finding that, as Kazimer was pursuing a fleeing suspect (Williams, 2012 WL 1138999, at *4; Robinson, 663 F.3d at 830), several other persons began shouting at him, in English and Spanish.  (Doc. 25, DX D, R. Ortiz dep., at 28-31, 33 ("several people"; doc. 25, DX E, A. Perez dep., at 41-43; doc. 27, PX 2, Manzano decl., at ¶¶ 12-15; doc. 27, PX 3, M.Perez decl., at ¶¶ 6-8.)  One person stepped into his path during the pursuit (doc. 27, PX 2, Manzano decl., at ¶ 6), and the parents began to attempt to interpose themselves

23

while Kazimer was in the process of attempting to secure Ortiz (doc. 25, DX D, R. Ortiz dep., at 52; doc. 25, DX E, A. Perez dep., at 43).

During this commotion, Kazimer was initially alone in attempting to gain control over a suspect in an armed robbery investigation.  The court finds Kazimer's actions in handcuffing and securing a person of interest, who had already fled once on the approach of the police, to be reasonable under the totality of the circumstances in what was a dynamic and chaotic situation.

The plaintiffs argue that the force used to seize and handcuff Ortiz was excessive.  While it may or may not have been necessary to forcibly pin Ortiz against the vehicle in order to place him in handcuffs, the force used to place him against the vehicle does not approach that which courts have found to be excessive in violation of the Fourth Amendment, even viewing the facts most favorably to the plaintiffs.

The court finds that the facts as provided by the plaintiffs, in view of the circumstances the officers confronted, assessed in light of clearly established legal rules concerning the use of excessive force, do not carry plaintiffs' burden of proof to show that Kazimer is not entitled to qualified immunity on this claim.

## 2.  Crisan

As to Officer Crisan's liability, to hold an individual officer liable for the use of excessive force, the plaintiffs must show that the officer:

> (1) actively participated in the use of excessive force, (2) supervised the
> officer who used excessive force, or (3) owed the victim a duty of
> protection against the use of excessive force.

Cole, 2011 WL 5924562, at *5 (quoting Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997)).  Ortiz claims that Crisan owed him a duty of protection against the alleged use of excessive force by Kazimer.  The deposition testimony of both of Ortiz's parents, co-plaintiffs, who were standing alongside him at the time of Kazimer's arrival, is that Crisan did not arrive on the scene until after Ortiz had been allegedly subjected to the excessive force.  (Doc. 25, DX D, R. Ortiz dep., at 31 (after Ortiz in handcuffs, other police arrived); doc. 25, DX E, A. Perez dep., at 42 (after Ortiz handcuffed, "that's when the other one arrived in the patrol car"); see also doc. 27, PX 2, Manzano decl., at ¶ 18 (second officer arrived after Kazimer handcuffed Ortiz)).  But see doc. 27, PX 3, M.Perez decl., at ¶¶ 9, 11.  No constitutional violation based on a duty of protection by Crisan is thus shown.  The motion for summary judgment, based on qualified immunity, on the failure to protect claim [Count 2] against Crisan should be granted.


## V.  STATE LAW IMMUNITY

In addition to the federal Section 1983 claims, the plaintiffs assert a number of state law claims.  The defendants argue that they are immune from all state law claims under Ohio Revised Code Chapter 2744.  (Doc. 25, at 6-7.)  They claim that state law "specifically grants immunity to employees of political subdivisions for

negligence claims arising out of the course and scope of the person's employment with the political subdivision."  (Doc. 25, at 6, citing Fabrey v. McDonald Vill. Police Dep't, 70 Ohio St.3d 351, 639 N.E.2d 31 (1994)).

The plaintiffs respond that they have submitted evidence that defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner," which would take the defendants outside the statutory immunity. (Doc. 27, at 28, quoting Ohio Rev. Code § 2744.03(A)(6)(b).)

Immunity is provided for employees of political subdivisions under Ohio Rev. Code § 2744.03(A)(6).  Shobe v. Seneca County Sheriff's Office, No. 3:07CV1783, 2008 WL 440582, at *4 (N.D. Ohio Feb. 13, 2008); Howard v. Taggart, No. 4:05CV1114, 2007 WL 2840369, at *8 n.6 (N.D. Ohio Sept. 27, 2007); Fabrey, 70 Ohio St.3d at 355-356, 639 N.E.2d at 35.  "By enacting R.C. 2744.03(A)(6), the Ohio legislature has determined that a police officer, for example, cannot be held personally liable for acts committed while carrying out official duties unless one of the exceptions to immunity is established."  Meredith v. Cleveland Hts. Police Dept.,  No. 93436, 2010 WL 2206405, at *4 (Ohio Ct. App. June 3, 2010) (citing Cook v. City of Cincinnati, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995)).  The statutory exceptions to the immunity, as quoted by plaintiffs, for "acts or omissions [done] with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6)(b).

26

"Malicious purpose" has been defined as the willful and intentional design to do injury, or to harm another, usually seriously, through conduct which is unlawful or unjustified.  Culberson v. Doan, 125 F.Supp.2d 252, 283-284 (S.D. Ohio 2000) (quoting Cook, 103 Ohio App.3d at 90, 658 N.E.2d at 821), and Caruso v. State, 136 Ohio App.3d 616, 620, 737 N.E.2d 563, 567-568 (2000)).  Although the court finds there is evidence that Ortiz was forcibly handcuffed (see generally doc. 25, DX D, R. Ortiz dep., at 27; doc. 25, DX E, A. Perez dep., at 40, 43; doc. 27, PX 2, Manzano decl., at ¶ 8; doc. 27, PX 3, M.Perez decl., at ¶ 5), Ortiz does not point to any evidence of a "willful and intentional design to do injury, or to harm another, usually seriously," through that spontaneous use of force.  See generally doc. 27, at 28-29.

"Bad faith involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another."  Culberson, 125 F.Supp.2d at 283 (quoting Cook, 103 Ohio App.3d at 90-91, 658 N.E.2d at 821).  Bad faith is prompted by some sinister motive.  Id. at 284.  Ortiz has not offered any specific facts that the defendants were acting in bad faith, that is, with a dishonest purpose, or an actual intent to mislead or deceive another.  Shobe, 2008 WL 440582, at *8; Culberson, 125 F.Supp.2d at 283-284; see generally doc. 27, at 28-29.

"Wanton" misconduct is "the failure to exercise any care whatsoever."  Shobe, 2008 WL 440582, at *7; Culberson, 125 F.Supp.2d at 283 (quoting Fabrey, 70 Ohio

27

St.3d at 356, 639 N.E.2d at 35).  The issue of wanton misconduct is normally a jury question.[9]  Fabrey, 70 Ohio St.3d at 356, 639 N.E.2d at 35; see also Harris v. City of Circleville, 583 F.3d 356, 370 (6th Cir. 2009) (quoting Fabrey).  However, the standard for showing wanton misconduct is high.  Shobe, 2008 WL 440582, at *7; Howard, 2007 WL 2840369, at *9; Fabrey, 70 Ohio St.3d at 356, 639 N.E.2d at 35.  The Supreme Court of Ohio in Fabrey spoke to this factor:

> In Roszman v. Sammett (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, 166, 269 N.E.2d 420, 422, we stated, "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."  Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury.  Id. at 97, 55 O.O.2d at 166, 269 N.E.2d at 423.

Fabrey, 70 Ohio St.3d at 356, 639 N.E.2d at 35; see also Culbertson, 125 F.Supp.2d at 283.  Ortiz has not offered any specific facts that the defendants were conscious that their conduct would in all probability result in injury.  Shobe, 2008 WL 440582, at *7; Fabrey, 70 Ohio St.3d at 356, 639 N.E.2d at 35; see generally doc. 27, at 28-29.

---

[9]  Nevertheless, in Fabrey, the state high court affirmed the lower court's grant of summary judgment on the basis of immunity, finding that the defendant's conduct did not rise to the level of wanton misconduct.  Fabrey, 70 Ohio St.3d at 357, 639 N.E.2d at 36.  See also Shobe, 2008 WL 440582, at *7-*8  (granting summary judgment on immunity); Howard, 2007 WL 2840369, at *9 (granting summary judgment); Cabaniss v. City of Riverside, 497 F.Supp.2d 862, 895-897 (S.D. Ohio 2006), aff'd, 2007 WL 1047588 (6th Cir. Apr. 6, 2007).

The motion for summary judgment on the state law claims should be granted, because Ortiz has failed to demonstrate specific facts showing that there is a genuine issue of material fact that defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner," which would take the defendants outside the state-law statutory immunity.  Ohio Rev. Code § 2744.03(A)(6).  The motion for summary judgment should be granted on counts five (battery), six (false arrest), seven (negligence), and nine (battery).

## VI.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The third count of the complaint alleges the intentional infliction of emotional distress, against Kazimer.  Under Ohio law, a claim for intentional infliction of serious emotional distress requires proof of four elements:

> (1) the defendant intended to cause emotional distress, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

Eblin v. Corrections Med. Ctr., 158 Ohio App.3d 801, 803, 822 N.E.2d 814, 820-821 (Ohio Ct. App. 2004) (citing Ashcroft v. Mt. Sinai Med. Ctr., 68 Ohio App.3d 359, 366, 588 N.E.2d 280, 284 (Ohio Ct. App. 1990)).

Under Ohio law, liability has been found for the intentional infliction of emotional distress "only where the conduct has been so outrageous in character, and

29

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Yeager v. Local Union 20, 6 Ohio St.3d 369, 375, 453 N.E.2d 666, 671 (1983).  Furthermore, an emotional distress claimant must demonstrate that the "extreme and outrageous conduct" caused the plaintiff "serious emotional distress."  Yeager, 6 Ohio St.3d at 369, 453 N.E.2d at 667 (syllabus); Hockenberry v. Village of Carrollton, 110 F.Supp.2d 597, 605 (N.D. Ohio 2000).

Ohio courts define "extreme and outrageous conduct" quite narrowly.  Baab v. AMR Services Corp., 811 F.Supp. 1246, 1269 (N.D. Ohio 1993).  A plaintiff must meet a very high burden to show extreme or outrageous conduct.  See generally Schliewe v. Toro, No. 04-1404, 2005 WL 1506168, at *7 (6th Cir. June 23, 2005) (Michigan); Watkins v. City of Southfield, 221 F.3d 883, 890 (6th Cir. 2000) (recovery for intentional infliction of emotional distress only in most egregious cases) (Michigan).

The Ohio Supreme Court has defined "serious" emotional distress in the following manner:

> Serious emotional distress describes emotional injury which is both severe and debilitating.  Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.

Wright v. Metrohealth Med. Ctr., 58 F.3d 1130, 1139 (6th Cir. 1995), cert. denied, 516 U.S. 1158 (1996) (quoting Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309,

30

317 (6th Cir.1989)); see also Eblin, 158 Ohio App.3d at 803, 822 N.E.2d at 821

("reasonable person, normally constituted, would be unable to cope adequately").

The defendants argue that the claim fails to satisfy any of the four elements. (Doc. 25, at 13.)  Ortiz, in contrast, responds that disputed issues of fact preclude summary judgment. (Doc. 27, at 31-32.)

Ortiz has not offered any specific facts demonstrating that Kazimer intended to cause Ortiz serious emotional distress, or that he should have known that his actions would result in serious emotional distress.  In addition, as noted above, Ohio courts define "extreme and outrageous conduct" narrowly, and the court does not find that Ortiz has met his burden to show "extreme or outrageous conduct" during the brief encounter.  Finally, the court does not find that being slammed against a vehicle, and handcuffed for 5 to 15 minutes would result in "serious emotional distress," such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress" which resulted.  See generally Wright, 58 F.3d at 1139; Eblin, 158 Ohio App.3d at 803, 822 N.E.2d at 821; see also Kahlich v. City of Grosse Pointe Farms, No. 03-2060, 2005 WL 65515, at *6 (6th Cir. Jan. 10, 2005) (conduct not outrageous or extreme, where plaintiff erroneously handcuffed and held in holding cell for 15 minutes).

In addition, Ortiz has failed to demonstrate specific facts showing that there is a genuine issue of material fact that defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner," which would

take the defendants outside the state-law statutory immunity.  Ohio Rev. Code §
2744.03(A)(6).

The motion for summary judgment should be granted on third count of the
complaint (intentional infliction of emotional distress).


## VII.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The fourth count of the complaint alleges the negligent infliction of emotional
distress, against Kazimer.  Under Ohio law, a plaintiff can recover for negligent
infliction of emotional distress where the emotional injuries are both serious and
reasonably foreseeable.  Ward v. County of Cuyahoga, 721 F.Supp.2d 677, 694-695
(N.D. Ohio 2010) (citing Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759, 765
(1983)).  Typically, recovery for negligent infliction of severe emotional distress has
been "limited to instances where the plaintiff has either witnessed or experienced a
dangerous accident and/or was subjected to an actual physical peril."  Kulch v.
Structural Fibers, Inc., 78 Ohio St.3d 134, 163, 677 N.E.2d 308, 329 (1997).

The defendants contend that Ortiz cannot recover for negligent infliction of
emotional distress because any actual physical peril resulted from his own actions
in fleeing from the police.[10]  (Doc. 25, at 14.)  Ortiz does not respond to this
argument.

Instead, Ortiz asserts:

---

[10]  They also contend that Ortiz's parents cannot recover.  (Doc. 25, at 14.)

> There is no dispute that both of Juan's parents were present during Kazimer's encounter with Juan.  Kazimer's argument that he cannot be held accountable for the emotional distress inflicted on Juan's parents – the parents of a special-needs child – relies on Kazimer's self-serving conclusion that he acted reasonably . . . From the record evidence, a reasonable jury could conclude that Kazimer did not act as a reasonable officer would have under the circumstances, and that he is therefore liable to Juan's parents for the emotional distress they sustained as a result of witnessing Juan's physical peril.  Summary judgment should be denied.

(Doc. 27, at 32-33.)

However, the complaint alleges that "Juan" [Ortiz] was subjected to physical peril from Kazimer, and that "Juan" suffered serious mental anguish.  (Doc. 1, at ¶ 67.)  The fourth count of the complaint does not allege negligent infliction of emotional distress as to his parents.  Id.  Only counts nine and ten of the complaint are asserted on behalf on his parents.  See doc. 1, at ¶¶ 82-88.  Thus, the defendants' argument that Ortiz himself cannot recover for negligent infliction of emotional distress is uncontested.

In addition, Ortiz has failed to demonstrate specific facts showing that there is a genuine issue of material fact that defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner," which would take the defendants outside the state-law statutory immunity.  Ohio Rev. Code § 2744.03(A)(6).

The motion for summary judgment should be granted on the fourth count of the complaint (negligent infliction of emotional distress).

## VIII.  CIVIL LIABILITY FOR CRIMINAL CONDUCT

The eighth and tenth counts of the complaint allege "Civil liability for criminal conduct under Ohio Rev. Code § 2307.60." (Doc. 1, ¶¶ 79-81, 86-88.)  Ohio courts have found that Section 2307.60 itself does not create a cause of action.  See, e.g., McNichols v. Rennicker, No. 2002 AP 04 0026, 2002 WL 31883700, at *3 (Ohio Ct. App. Dec. 18, 2002); see also Garrett v. Fisher Titus Hosp., 318 F.Supp.2d 562, 578 (N.D. Ohio 2004) (citing McNichols).  A separate civil cause of action must be available to bring a civil claim based upon a criminal act.  McNichols, 2002 WL 31883700, at *3.

Rather, Section 2307.60 allows for civil recovery of damages for persons injured by a criminal act.  Ohio Rev. Code § 2307.60.  There must be a criminal conviction before civil liability arises under this section.  Tri-State Computer Exchange, Inc. v. Burt, No. C-020345, 2003 WL 21414688, at *5 (Ohio Ct. App. June 20, 2003) (citing cases); Hite v. Brown, 100 Ohio App.3d 606, 611 n.1, 654 N.E.2d 452, 455 n.1 (Ohio Ct. App. 1995); see generally Culberson, 125 F.Supp.2d at 279-280 (plaintiffs have no standing to assert state criminal statute as civil tort).

Here, Ortiz has not alleged, nor does the record show, any criminal conviction of the defendants arising out of this incident.  Ortiz has failed to designate specific facts showing that there is a genuine issue for trial on these two counts.  The motion for summary judgment should be granted on counts eight and ten.

34

## IX.  RECOMMENDATION

The motion for summary judgment (doc. 25) should be granted, as discussed above.


Dated:  ___June 5, 2013___                    ___/s/ Kenneth S. McHargh___
                                              Kenneth S. McHargh
                                              United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).