IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
                                                       : CASE NO.  1:11 CV 01521
JUAN ORTIZ, et al.,                                    :
                                                       :
                                        Plaintiffs,    : MEMORANDUM OF OPINION AND
                                                       : ORDER ACCEPTING IN PART AND
                         -vs-                           : REJECTING IN PART THE
                                                       : RECOMMENDATION OF THE
                                                       : MAGISTRATE JUDGE AND GRANTING
BRIAN KAZIMER, et al.,                                 : IN PART AND DENYING IN PART THE
                                                       : DEFENDANTS' MOTION FOR
                                        Defendants.    : SUMMARY JUDGMENT
------------------------------------------------------- :


UNITED STATES DISTRICT JUDGE LESLEY WELLS

     The plaintiffs Juan Ortiz,[1] Ramón Ortiz, and Alma Peréz brought this lawsuit against

defendants Brian Kazimer and Dan Crisan, both of them police officers with the Cleveland

Division of Police. The plaintiffs allege that the defendants violated the constitutional rights of

plaintiff Juan Ortiz, a minor with Down syndrome, when he was stopped without reasonable

suspicion, pulled from his mother's arms, slammed against a car, handcuffed, and pinned against

_____

[1]Juan E. Ortiz appears by and through next friend, Ramón Ortiz.

the car for upwards of forty-five minutes. The plaintiffs bring state law tort claims arising from the same incident.

The officers moved for summary judgment. The motion was referred to United States Magistrate Judge Kenneth S. McHargh for report and recommended decision. The magistrate judge recommended that summary judgment be granted as to each of the plaintiffs' claims. Upon *de novo* review of the record, the Court agrees, in part, and disagrees, in part, with the magistrate judge's recommendation. For the reasons described below, the defendants' motion will be granted, in part, and denied, in part.

## I.

In the late afternoon of 16 August 2010, Cleveland Police Officers Kazimer and Crisan were looking for a robbery suspect -- a white man, about 5'8", wearing a hat and a long shirt, who had reportedly robbed a man of his wallet at gun point near 14577 Lorain Avenue. (Doc. 25-1 at 1). While searching for the man, the officers learned that the wallet had been found by two men, who had turned it in to Nina Kennedy, the manager of a nearby apartment complex called the West Terrace Apartments. (Kennedy Decl. ¶5). Ms. Kennedy provided the police with the descriptions of the two men: one being a white man with dirty blonde hair and a mustache wearing a blue t-shirt and, the second, an older man, in his fifties, clean shaven with a ball cap, possibly wearing a red shirt. (Doc. 25-1 at 3; Kazimer Dep. at 14; Kennedy Decl. at ¶¶4-5). These descriptions were radioed to Officers Kazimer and Crisan. (Doc. 25-1 at 3).

While driving in the vicinity of the West Terrace Apartments, the officers spotted a person wearing a red shirt (which was a partial match to one of the descriptions) standing about twenty-five feet away. (Kazimer Dep. 17:21 - 18:14). That person, it was later learned, was the

2

plaintiff Juan Ortiz. Juan is Hispanic and he has Down syndrome. At the time, he was sixteen years old, but according to witnesses, he appeared to be younger, around twelve or thirteen. (A. Peréz Dep. at 14; Kennedy Decl. at ¶3). He was under five feet tall, and he weighed about one hundred pounds. (L. Hernandez Decl. at ¶3).

Immediately after the police saw him, Juan began to run. (Kazimer Dep. at 18:18 - 18:23). It is not clear why he ran. As the officers understood it at the time, he was fleeing the police, but it is not certain whether Juan had seen or heard them. During his deposition, Officer Crisan was unable to say whether Juan had seen the officers before he ran, and according to Juan's brother, Juan was listening to the radio in headphones at the time. (Crisan Dep at 23; R. Ortiz Resp to Interrog No. 8). Whatever the case, Juan ran. The officers claim they did not get a close look at him before he ran,[2] but on the basis of the red shirt, his flight, and his proximity to the crime, Officer Kazimer decided to exit the car and give chase on foot. (Kazimer Dep. at 23). Officer Kazimer testified that he ordered Juan to stop, but Juan kept running. (Kazimer Dep. at 28). Officer Crisan drove the cruiser in the direction he suspected Juan would go.

Juan Ortiz and his family live at the West Terrace Apartments. As Officer Kazimer undertook his foot chase, the boy's parents and other family members were congregated nearby in the West Terrace parking lot. The officer's pursuit of Juan lasted about thirty seconds. (Kazimer Dep. at 28). The officer caught up to Juan in the parking lot. There he found, according to the plaintiffs, that the boy had run up to, or, by one account, into the arms of, his mother, plaintiff Alma Peréz. (A. Perez Dep at 39-40; Manzano Decl. at ¶8). Based on the testimony of bystanders (though disputed by the defendants), Officer Kazimer grabbed the boy from behind,

---

[2]Officer Crisan initially reported seeing a "black man" in a "red shirt." (Doc. 25-1, at 3).

forcibly slammed him against the family's car, and handcuffed him. (Manzano Decl. at ¶8; R. Ortiz Dep. at 27; M. Peréz Decl at ¶5). The plaintiffs claim that Juan was pinned against the car, with his face pressed against it for up to forty-five minutes.

The plaintiffs maintain that Officer Kazimer was informed by bystanders, both before and after he pinned Juan against the car, that Juan was a boy with Down syndrome. (R. Ortiz Dep. at 29; Manzano Decl. at ¶6). According to the defendants the scene was chaotic, and it is undisputed that numerous bystanders were shouting at Officer Kazimer in Spanish and in English. Juan's father, Ramón Ortiz, and his mother Alma Peréz were attempting to interpose themselves between Officer Kazimer and Juan. Ramón Ortiz was reportedly attempting to insert his hand between Juan's face and the surface of the hot car. (A. Perez Dep. at 43). Ms. Peréz maintains that during this time, Officer Kazimer pushed her to the ground as she attempted to intervene. (A. Peréz Resp. To Interrog. No. 12; Kennedy Decl. at ¶8; Posey Decl. at ¶5; Acevedo Decl. at ¶5; Manzano Decl. at ¶12). There is evidence that the commotion may have subsided minutes after the stop was initiated, as it was reported to dispatch that "ALL [is] OK CALMING DOWN." (Doc. 25-1). At some point, Officer Crisan found his way to the scene and, according to the plaintiffs, was present while Officer Kazimer kept Juan pinned against the car. (A. Peréz Resp. To Interrog. No. 9).

According to the plaintiffs, the bystanders continued to inform the officers that Juan was an innocent boy with Down syndrome. The plaintiffs claim that the officers responded unprofessionally using vulgar language and racial epithets. According to Ramón Ortiz, Officer Kazimer advised him that they were "lucky he didn't shoot [Juan]." (R. Ortiz Dep. at 50). According to another witness, one of the officers told Juan's mother to "get the [hell] back to

4

where she belongs," and he called her a "Mexican wetback." (Kennedy Decl. at ¶9; Posey Decl. at ¶7). The officers deny having said anything of this nature. (Kazimer Dep. at 53-54;).

There is little consensus as to how long Juan was detained. According to the police, the incident was very brief -- five minutes or less, from the beginning of the foot chase to the time of Juan's release. Officer Kazimer claims that he held Juan against the car for only a few seconds. (Kazimer Dep. at 35). By his account, he moved Juan away from the car, at which point he had an opportunity to look Juan in the face. (Kazimer Dep. at 38). Officer Kazimer acknowledged that it appeared to him at that time that Juan had a disability. (Id.). According to the dispatch log, backup officers arrived about three minutes after Juan was initially stopped. (Doc. 25-1 at 4). These additional officers spoke with Nina Kennedy who confirmed that Juan was not involved in the robbery. (A. Peréz Dep. at 43-44). Juan was then released. (A. Peréz Dep. at 45).

The plaintiffs do not dispute that when backup officers arrived, they spoke to Nina Kennedy, who had earlier provided the descriptions of two of the men to the police. The plaintiffs do not dispute that when the conversation with Ms. Kennedy concluded, Officer Kazimer released Juan. (A. Peréz Dep. at 45). The plaintiffs claim, however, that Juan's detention was considerably longer in duration than the defendants say it was. The detention lasted, the plaintiffs claim, somewhere between fifteen and forty-five minutes and Juan was pinned, with his face pressed against the hot car, between five and fifteen minutes.[3]

---

[3]     Malvin Peréz stated that Juan was pinned for five minutes and then detained for another ten. (M. Peréz Decl. at ¶12). According to Ramón Ortiz, Officer Kazimer held Juan against the car for at least fifteen minutes. (R. Ortiz Dep. at 50). Eliezer Manzano stated that Juan was pinned for five minutes and detained in handcuffs for another fifteen to twenty minutes. (Manzano Decl. at ¶¶21-22). Alma Peréz testified that Juan was in handcuffs for fifteen to twenty minutes. (A. Peréz Dep. at 46). Nina Kennedy, the apartment manager, testified that Juan was pinned

According to the police dispatch log, however, the accuracy of which the plaintiffs do not contest, the entire incident, from the initial pursuit to the departure of the police, lasted about twenty-two minutes.[4]

As a result of the defendants' actions, the plaintiffs maintain, Juan experienced chest pain, abrasions to the wrists, and a supra-pubic abscess, which required surgery. The plaintiffs also state that Juan was diagnosed with post-traumatic stress disorder resulting from the officers actions.

The plaintiffs filed this lawsuit, alleging that Officer Kazimer violated Juan's federal constitutional rights, when the officer allegedly stopped Juan without reasonable suspicion, pulled him from his mother's arms, slammed him against a car, handcuffed him, and pinned him against the car. And it is alleged that Officer Crisan is constitutionally liable for failing to protect Juan from Officer Kazimer's use of excessive force.

---

against the vehicle for fifteen to twenty minutes and he was placed in a police car for an additional length of time after that. (Kennedy Decl. at ¶10). Jean Posey, who was babysitting in an apartment nearby, testified that the whole incident lasted fifteen to twenty-five minutes. (Posey Decl. at ¶9). Finally, at the high end, Yahaira Acevedo estimated that Juan was pinned against the car and then in handcuffs for thirty to forty-five minutes. (Acevedo Decl. at ¶6).

[4]     The dispatch log, which does not show precisely when Juan was released, documents the following:

At 5:33 p.m., it was reported that Kazimer was in pursuit of Juan.
At 5:35, it was reported that Juan was apprehended.
At 5:37 p.m., it was reported that "ALL [is] OK CALMING DOWN."
At 5:38 p.m., it was reported that a backup unit had arrived.
At 5:57 p.m., it was reported that the officers were directed to another location.

(Doc. 25-1).

6

Under state law, the plaintiffs allege that Officer Kazimer is liable as to Juan for tort claims of battery, false arrest, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. The plaintiffs also maintain that Officer Crisan is liable for negligence as to Juan.

Ms. Peréz asserts a state law claim of battery as to Officer Kazimer, and all three plaintiffs allege that Officer Kazimer is civilly liable for criminal conduct pursuant to R.C. § 2307.60.

The defendants moved for summary judgment, asserting qualified immunity and state law immunity pursuant to R.C. 2744.03. The motion was referred to United States Magistrate Judge Kenneth McHargh for report and recommended decision. The magistrate judge recommended that the defendants' motion be granted in its entirety. The plaintiffs' objections to that recommendation are now before the Court.

## II.

### A. *Review of the Magistrate Judge's Recommendation*

When considering a party's objections to a magistrate judge's recommended decision, this Court reviews *de novo* those portions of the recommendation to which a party has specifically objected. Local Rule 72.3(b). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." Id. A failure to file specific objections amounts to a waiver of the right to appeal the magistrate judge's recommendations. Thomas v. Arn, 474 U.S. 140, 155 (1985); Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 508–09 (6th Cir. 1991).

7

*B. Summary Judgment*

When a defendant moves for summary judgment based on qualified immunity, this Court generally looks to the plaintiff's version of the facts, draws all reasonable inferences in the plaintiff's favor, and decides whether there is sufficient evidence on the record by which a rational jury might find in the plaintiff's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The plaintiff need not prove anything on summary judgment; instead, the plaintiff must identify evidence sufficient to support a verdict in his or her favor. The Court may not weigh the evidence or decide the credibility of witnesses. Anderson, 477 U.S. at 255. That is for the jury. The Court's role is to decide whether there are fact issues to be tried.

Under the Federal Rules, the Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate when there is a genuine issue as to the material facts. Anderson, 477 U.S. at 255. In this instance, having carefully considered the evidence before it, the Court is persuaded that some, but not all, of the issues presented in this case must be decided by a jury.

*C. Qualified Immunity*

To prevail on a section 1983 claim, a plaintiff "must establish that a person acting under color of state law deprived [him or her] of a right secured by the Constitution or laws of the United States." Smoak v. Hall, 460 F.3d 768, 777 (6th Cir. 2006) (citing Waters v. City of Morristown, 242 F.3d 353, 358-59 (6th Cir. 2001)). A defendant may assert "the defense of qualified immunity, which shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

8

reasonable person would have known.'" <u>Id.</u> (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). "In qualified immunity cases, the plaintiff bears this burden; [he or she] must show that the defendant is not entitled to qualified immunity." <u>Wysong v. City of Heath</u>, 260 Fed.Appx. 848, 852 (6th Cir. 2008) (citing <u>Wegener v. City of Covington</u>, 933 F.2d 390, 392 (6th Cir. 1991)).

When determining whether the allegedly injured party has met this burden, the Court "typically employs a two-step analysis," asking: "'(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" <u>Smoak</u>, 460 F.3d at 777 (quoting <u>Estate of Carter v. City of Detroit</u>, 408 F.3d 305, 310-11 (6th Cir. 2005)).

### III.

### A. The initial stop

The Court is in agreement with the magistrate judge that as a matter of law the officers had reasonable suspicion to conduct an investigatory stop in this instance. "[A] police officer may in appropriate circumstances and in an appropriate manner stop a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." <u>Terry v. Ohio</u>, 392 U.S. 1, 22 (1968). The test is whether under the totality of the circumstances the officer has a particularized and objective basis for suspecting wrongdoing. <u>United States v. Pearce</u>, 531 F.3d 374, 380 (6th Cir. 2008). To determine whether the officer acted reasonably under the circumstances, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>Terry</u>, 392 U.S. at 27. "[T]he

likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002).

The following, undisputed evidence is relevant here: The officers were looking for an armed robbery suspect in the area where the armed robbery had recently occurred; The officers received the descriptions of three individuals who reportedly had been in possession of the victim's wallet after the robbery took place; One of those individuals was a male who may have been wearing a red shirt; Immediately after receiving the descriptions, the officers spotted a male wearing a red shirt in close proximity to where the crime occurred; That person ran from the officers.

These specific circumstances viewed from the perspective of a reasonable officer are sufficient to justify Officer Kazimer's decision to investigate further. Flight is a recognized indicia of wrongdoing. In Illinois v. Wardlow, 528 U.S. 119, 124 (2000), the U.S. Supreme Court approved a Terry stop involving an individual who ran from the police while in a "high crime area." In addressing the relevance of "headlong flight" to a reasonable suspicion analysis, the Court concluded that "wherever it occurs--[it] is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. at 124-25. Further, the temporal and geographic proximity of a suspect to the scene of a crime are also factors relevant to reasonable suspicion. See, e.g., United States v. Galaviz, 645 F.3d 347, 353 (6th Cir. 2011).

In this instance, the Court recognizes the unchallenged fact that Juan had committed no crime and that except for being a male and wearing a red shirt, his appearance overall differed

10

from the descriptions received by the officers. In hindsight and given all that is known now, it is easy to take issue with Officer Kazimer's on-the-spot judgment, but when the totality of the circumstances is considered from a reasonable officer's perspective at the time, the Court has little trouble concluding, consistent with the conclusion of the magistrate judge, that the initial stop was warranted as a matter of law. Under Terry, it is an acceptable risk that innocent people will, from time to time, be stopped by the police. It is beyond dispute that this is one of those instances -- and an unfortunate one at that. However, Juan's red shirt, which matched the description of an individual connected to the stolen wallet, Juan's immediate flight when the officers appeared, and Juan's close physical and temporal proximity to a violent crime provided the officers with reasonable suspicion to investigate further.

### B. The Length of Juan's Detention

The Court further agrees with the Magistrate Judge that the plaintiffs have failed to establish a constitutional violation with respect to the length of Juan's detention.

The discussion begins with the parties' dispute as to how long the stop lasted: the plaintiffs claim up to forty-five minutes, and the defendants claim only five. Obviously, this discrepancy cannot be resolved on summary judgment. However, the Court may reject a party's version of the facts for the purposes of summary judgment, where the factual assertion is so "blatantly contradicted by the record, . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007). In this instance, the Court agrees with the magistrate judge that the plaintiffs' claim that the stop lasted up to forty-five minutes should be so characterized. Six of the plaintiffs' seven declarants claimed that the stop lasted somewhere between fifteen to twenty-five minutes. The dispatch log, whose accuracy is not disputed, shows that from

11

beginning to end the whole incident lasted no more than twenty-two minutes. Clearly, the estimate of forty-five minutes is an outlier that is "blatantly contradicted by the record." Thus, the claim that the incident lasted up to forty-five minutes is rejected. It is assumed, therefore, for the purposes of the defendants' motion, that Juan was detained for up to twenty-five minutes, which is the next highest estimate that reasonably comports with the record as a whole.

In any event, whatever the length of the stop, whether five or twenty-five minutes, the Court concludes that no constitutional violation occured. There is no rigid time limit for a Terry stop.  United States v. Sharpe, 470 U.S. 675, 685 (1985). In determining whether the length of a Terry stop is unjustified, the Court considers "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." Id. at 686. When it is apparent based on the the totality of the circumstances that "the police [were] acting in a swiftly developing situation,. . . the court should not indulge in unrealistic second-guessing." Id. A Terry stop is not unreasonable just because its objectives might have been accomplished through an alternative, less intrusive means.  Cady v. Dombrowski, 413 U.S. 433, 447 (1973). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Sharpe, 470 U.S. at 687.

In this instance, the police were acting in a swiftly developing situation. An armed robbery had just occurred, and the officers received the descriptions of three individuals connected to the crime, one of whom was wearing a red shirt. Soon after receiving the descriptions, the officers saw someone wearing a red shirt in the area where the crime occurred, and that person ran away. That person, of course, was Juan, though the officers did not know it at

12

the time. As already discussed, Officer Kazimer had reasonable suspicion to stop Juan on these facts. It is undisputed that when Officer Kazimer caught up to Juan, the officer found himself in a tense situation, with numerous bystanders shouting at him and attempting to intervene. In these particular circumstances, even if it is assumed that the commotion quickly subsided as the plaintiffs suggest it did, Officer Kazimer did not act unreasonably by waiting for backup to establish whether Juan was involved or not. It is undisputed that backup arrived no more than three minutes after Juan was stopped. As soon as additional officers arrived, they spoke with Nina Kennedy, the apartment manager who had initially provided the descriptions of the men who turned in the wallet. Although it is not clear how long that conversation lasted, at its conclusion, Juan was released. As determined by the magistrate judge, the plaintiffs provide no evidence of unreasonable delay in this sequence of events.

The plaintiffs' primary argument that the length of the Terry stop was of an unreasonably long duration is that it should have been obvious to officers that Juan was not involved in criminal activity, because his appearance differed significantly from the descriptions provided to the officers. The plaintiffs maintain that given the differences, Juan should have been immediately released. In support, the plaintiffs cite United States v. Jackson, 188 F. App'x 403, 410 (6th Cir. 2006). In the Court's view, the plaintiffs misread the reach of Jackson. In that case, officers were provided with a description of a drug trafficking suspect -- black male, 30s, bald, wearing a long-sleeved gray or white t-shirt, and black or blue jeans, reportedly driving a green BMW traveling westbound. Id. at 404-05. The officers stopped someone who hardly matched the description at all -- a black male, with a full head of hair, wearing a short-sleeved black t-shirt driving a green Dodge Neon headed eastbound. Id. at 405-06. The court held that the officers

13

lacked reasonable suspicion to stop the motorist, in light of the glaring discrepancies between the descriptions provided to the officers and the individual who was stopped. Id. at 409-10.

The present case is similar to Jackson in one respect: there are discrepancies between Juan's appearance and the description received by officers Crisan and Kazimer. But there are several things that make it different, and thus unpersuasive in this instance. First, Juan ran from the police after he was seen in an area where an armed robbery occurred, which provided an independent factor supporting the officers' decision to stop him. As discussed above, flight is a accepted indicia of wrongdoing. As such, even though Juan only partially matched one of the descriptions that had been provided to the officers, the officers had a reasonable basis for detaining him until they could determine if he was involved. In contrast, the officers in Jackson had no independent basis to be suspicious of the driver in the Dodge Neon, who was driving the speed limit at the time of the stop. Second, upon catching up with Juan, Officer Kazimer found himself alone in an arguably chaotic situation with numerous bystanders shouting at him and attempting to interpose themselves between him and Juan. Under these circumstances and unlike the officers in Jackson, Officer Kazimer was not in a position to make a definitive, on-the-spot judgment whether Juan was involved in the robbery or not. It was not unreasonable for Officer Kazimer to maintain control over the situation, while allowing backup, which arrived within minutes, to sort out the facts.

The plaintiffs rely on a second, recent Sixth Circuit opinion, in which the court held that a male 911 caller's overheard comment that he was "gonna kill that bitch" did not provide officers with a legal basis to point their guns at a woman, throw her to the ground, and handcuff her, when the woman was seen driving away from the premises where the 911 call originated.

14

See Brown v. Lewis, No. 14-1392, 2015 WL 794705 (6th Cir. Feb. 26, 2015). As with Jackson,

supra, this is a case where officers could have easily determined that they had stopped someone

unconnected to a crime, and for the same reasons that Jackson is inapplicable here, so is Brown.

Unlike the present case, officers in those cases had no basis (outside of the descriptions they

were given) to believe that the detainee was implicated in a crime.

In sum, consistent with the recommendation of the magistrate judge, the Court concludes

that the plaintiffs have failed to produce evidence of an unjustifiable delay. In order for the Court

to hold that Officer Kazimer should have taken a different, less intrusive route to dispelling his

suspicions under these particular circumstances would require impermissible second-guessing of

the officer's actions. With the benefit of hindsight is it readily apparent that Juan was

unconnected to the robbery, but even with the facts viewed in the plaintiff's favor, the Court is

not persuaded that officers acted unreasonably by failing to immediately recognize it at the time.

*C. Officer Kazimer's use of force*

On the question whether Officer Kazimer used more force than reasonably necessary, the

Court respectfully disagrees with the magistrate judge's conclusion. There is sufficient evidence

in the record to show that the use of force was excessive. As described by one witness, Officer

Kazimer approached Juan after the boy had run into his mother's arms. (Manzano Decl. at ¶8).

The officer, though denying that the boy went to his mother, admits that at this point, the boy

was "surrendering," and there is no evidence at any point thereafter that Juan attempted to flee,

offered any resistance, or struggled with the officer in any way. (Kazimer Dep. at 33). There is

evidence that Officer Kazimer grabbed Juan from behind, pulled him from his mother's arms,

and "slammed" him into the car "like a football player making a tackle." (Manzano Decl at ¶8).

15

According to that witness, the radio that Juan was carrying flew out of his hands as a result of the force employed by the officer. (Manzano Decl at ¶8). Officer Kazimer pinned Juan against the car and applied handcuffs to his wrists. It is undisputed that at the time Juan was under five feet tall and weighed about 100 pounds (L. Hernandez Decl at ¶3), and Officer Kazimer was ten inches taller and over twice Juan's weight. (Kazimer Dep at 66).

The plaintiffs cite evidence that as a result of the incident Juan suffered from chest pains, abrasions to his wrists, and a suprapubic abscess that required surgery.[5] (R. Ortiz Decl. at ¶2). Based on the plaintiffs' expert report, Juan suffers from post-traumatic stress disorder as a result of the encounter. (P. Grier Report at 5). His symptoms include recurrent nightmares, hypervigilance, and an exaggerated startle response. (Id.). The plaintiff's expert further noted that Juan "persistently re-experienced the traumatic event with distressing recollections that he demonstrated by putting his hands out as if he were being handcuffed." (Id.).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989)). The proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id.

---

[5]     The defendants argue that the Court should reject, as a matter of law, the claim that the suprapubic abscess was caused or exacerbated by the actions of the defendants. The Court disagrees. The defendants will have an opportunity at trial to establish a lack of causation.

16

In the present case, Officer Kazimer was investigating a serious crime--armed robbery. Given Juan's red shirt and his flight, the officer had reason to suspect that Juan was somehow connected to the incident, but there is little in the record to support the belief that Juan posed a threat, and the defendants provide no articulable reason to believe that Juan was an immediate danger to anyone. Juan had stopped running, and he was, in the officer's own words, "surrendering." Moreover, Officer Kazimer testified that Juan was compliant throughout the entire incident, and there is no evidence that Juan resisted or attempted to flee.

In the Sixth Circuit, "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." Baker v. City of Hamilton, 471 F.3d 601, 607 (6th Cir. 2006) (denying qualified immunity where plaintiff was struck after surrendering to police); see also Shreve v. Jessamine County Fiscal Court, 453 F.3d 681, 687 (6th Cir. 2006) (finding it objectively unreasonable for an officer to strike and jump on a suspect who was already on the ground and "out of it" due to the officer's application of pepper spray). In this instance, drawing all reasonable inferences in favor of the plaintiff, as it must, the Court concludes that there is sufficient evidence for a rational jury to conclude that Officer Kazimer used more force than was reasonably necessary when he slammed and pinned the boy against the car, and handcuffed him, after Juan had already surrendered. Juan's right to be free from such force was clearly established at the time of the incident. See Shreve, 453 F.3d at 688 ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."). While the defendants deny that Officer Kazimer pulled Juan from his mother's arms and slammed the boy against the car, it is not this Court's role to resolve this factual dispute on summary judgment. That is for a jury.

17

*D. Failure to protect from excessive force against Officer Crisan*

The magistrate judge recommended granting summary judgment with respect to the failure to protect claim against Officer Crisan. In the magistrate judge's view, because the plaintiffs provide no evidence to show that officer Crisan was present when Officer Kazimer allegedly used excessive force, Officer Crisan cannot be held liable for failing to protect against it.

The Court agrees with this assessment in one respect, but not in another. To the extent that the plaintiffs maintain that Officer Kazimer's initial use of force was excessive (when he allegedly grabbed Juan and slammed him against the car), no failure to protect claim lies against Officer Crisan, since there is no evidence to show that Officer Crisan was present when Officer Kazimer took this action. However, there is record evidence to show that Officer Crisan was present while Officer Kazimer kept Juan's face pressed against the car. To the extent that the plaintiffs are able to prove that this use of force was excessive, they may assert a failure to protect claim against Officer Crisan.

*E. The plaintiffs' state law claims*

*1. Immunity under state law*

The magistrate judge concluded that summary judgment is appropriate as to the plaintiffs' claims of battery, false arrest, and negligence, on the ground that the officers are entitled to state law immunity on those claims. The magistrate judge further recommended summary judgment as to the plaintiffs' claims of negligent infliction of emotional distress and intentional infliction of emotional distress. As described below, the Court agrees, in part, and disagrees, in part.

18

First, the Court respectfully disagrees with the magistrate judge's conclusion that defendants are immune from the plaintiffs' state law claims. Under Ohio Revised Code § 2744.03(A)(6), employees of political subdivisions "cannot be held personally liable for acts committed while carrying out official duties." <u>Meredith v. Cleveland Hts. Police Dep't</u>, 2010-Ohio-2472, ¶ 28, 2010 WL 2206405, at *4 (Ohio Ct. App. June 3, 2010) (citing <u>Cook v. Cincinnati</u>, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1995)). There are exceptions, however. For instance, and relevant here, when an officer acts or fails to act "with malicious purpose, in bad faith, or in a wanton or reckless manner," statutory immunity does not apply. R.C. § 2744.03(A)(6)(b). Malicious purpose involves "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." <u>Cook v. Cincinnati</u>, 103 Ohio App. 3d 80, 90, 658 N.E.2d 814, 821 (1995).

Upon *de novo* review of the record, the Court concludes that the plaintiffs have produced sufficient evidence by which a rational jury could find that the defendants acted with malicious purpose during their encounter with the plaintiffs. As discussed in the section above, there is evidence that Officer Kazimer used greater force than was reasonably necessary under the circumstances, when he slammed Juan against the car after Juan had surrendered. And there is evidence that Juan was injured as a result. In addition, there is evidence that during the incident one of the officers told Juan's mother to "get the [hell] back to where she belongs," and he called her a "Mexican wetback." (Posey Decl. at ¶7). Another witness claims that one of the officers told "Juan's parents to go back to their own country if they can't speak the language." (Kennedy Decl. at ¶9). According to a third witness, one of the officers said "You don't know English, shut up, you shouldn't live in the United States if you don't know English." (Manzano Decl. at ¶20).

19

According to Ramon Ortiz, Officer Kazimer informed him that they were "lucky he didn't shoot [Juan]." (R. Ortiz Dep at 28:22 - 29:11). Based on this evidence, a rational jury could find that the officers were acting with a malicious purpose. See Piro v. Franklin Twp., 102 Ohio App.3d 130, 140, 656 N.E.2d 1035 (1995) (plaintiff's testimony that a police officer had called him a "guinea," a "wop," and a "mobster" was sufficient probative evidence of malice); MacNamara v. Gustin, No. 17575, 1999 WL 355844, at *6 (Ohio Ct. App. June 4, 1999) (in an excessive force case, the plaintiffs' sworn statements that police officer "had expressed that he did not like people like them could be viewed as evidence of the maliciousness of his conduct"). The Court accordingly concludes that the defendants are not entitled to across-the-board state law immunity from the plaintiffs' tort claims.

*2.False arrest*

The next question is whether the plaintiffs have provided sufficient evidence to support each of their state law claims. With respect to the false arrest claim, they have not. A claim of false arrest "requires proof that one was intentionally confined within a limited area, for any appreciable time, against his will and without lawful justification." Evans v. Smith, 97 Ohio App.3d 59, 646 N.E.2d 217, 224 (1994) (citing Feliciano v. Kreiger, 50 Ohio St.2d 69, 362 N.E.2d 646 (1977) ). As discussed above, *supra*, § III.A & B, the officers in this instance were legally justified to detain Juan for the duration of the stop, even though the actions they took during the detention may have crossed the line. Therefore, because the plaintiffs do not present evidence to support their false arrest claim, summary judgment will be granted as to Count 6 of the complaint.

20

*3. Battery and negligence*

Juan's battery and negligence claims may proceed against Officer Kazimer. Under Ohio law, battery is defined as intentional, harmful contact that results in injury. Love v. City of Port Clinton, 37 Ohio St. 3d 98, 99, 524 N.E.2d 166, 167 (1988). To prove negligence, a plaintiff must show that his injury resulted from the defendant having breached a duty owed to the plaintiff. As discussed *supra*, § III.C, the plaintiffs have produced sufficient evidence by which a reasonable jury could find in the plaintiffs' favor on these claims. Juan's battery and negligence claims against Officer Kazimer may accordingly move forward.[6]

As for Ms. Peréz's battery claim, she claims that Officer Kazimer "intentionally shoved" her, and other witness accounts indicate that Ms. Peréz was pushed to the ground. However, the plaintiffs fail to direct the Court's attention to any evidence in the record showing that Ms. Peréz suffered damages as a result of this contact. Further, it is undisputed that Ms. Peréz was trying to intervene as Officer Kazimer was attempting maintain control over the situation. The plaintiffs have not demonstrated that the officer used more force than reasonably necessary under these circumstances. See D'Agastino v. City of Warren, 75 Fed.Appx. 990, 995 (6th Cir.2003) ("If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery."). Therefore, the defendants' motion will be granted as to Count 9 of the complaint.

---

[6]     The plaintiffs assert a negligence claim on behalf of Juan against Officer Crisan. In responding to the defendants motion for summary judgment, the plaintiffs do not dispute that the negligence claim against Officer Crisan is unsupported by the record. Summary judgment will be granted as to the negligence claim against Officer Crisan.

21

*4. Intentional infliction of emotional distress*

Juan asserts a claim of intentional infliction of emotional distress. To succeed on such a claim, a plaintiff must prove that (1) the defendant intended to cause emotional distress, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure. Ashcroft v. Mt. Sinai Med. Ctr., 68 Ohio App.3d 359, 366, 588 N.E.2d 280 (Ohio Ct. App. 1990).

In this instance, there is evidence that Juan was psychologically injured as a result of the police encounter. However, the plaintiffs fail to provide evidence that Officer Kazimer's actions were extreme and outrageous. As discussed above, the officers' decision to detain Juan was supported by reasonable suspicion. Although there is record evidence by which a jury could conclude that Officer Kazimer used more force than was reasonably necessary during his detention of Juan, this does not automatically translate into "extreme and outrageous" conduct going "beyond all possible bounds of decency." See Gill v. Kovach, 729 F. Supp. 2d 925, 941 (N.D. Ohio 2010). While there is evidence that officers used vulgar and racist language, the plaintiffs draw no connection between Juan's emotional injury and what the officer said. Further, even if Officer Kazimer knew of Juan's disability, as the plaintiffs contend, the severity of the officer's conduct is mitigated by the fact that he at least reasonably suspected Juan was connected to recent criminal activity. There is no bright line rule that the existence of a disability

22

precludes an individual from being a suspect in a crime. In sum, while there is evidence on the record to show that the officer acted unreasonably during Juan's detention, the facts viewed in the plaintiffs' favor do not support the claim that the officer's conduct was extreme and outrageous. Therefore, summary judgment will be granted as to Count 3 of the complaint.

### *5. Negligent infliction of emotional distress*

Under Ohio law, a plaintiff can recover for negligent infliction of emotional distress where "the plaintiff has either witnessed or experience a dangerous accident and/or was subjected to an actual physical peril." Kulch v. Structural Fibers, Inc., 1997-Ohio-219, 78 Ohio St. 3d 134, 163, 677 N.E.2d 308, 329 (1997). The plaintiff's emotional injuries must be both serious and reasonably foreseeable. Ward v. County of Cuyahoga, 721 F.Supp.2d 677, 694-95 (N.D. Ohio 2010). In this instance, there is evidence to show that Juan suffered serious emotional injury as a result of an actual physical peril. According to the plaintiffs' expert, following the incident Juan presented with symptoms of post-traumatic stress disorder. And there is evidence that after Juan had surrendered, he was pulled from his mother's arms and slammed against a car. Based on this evidence, a jury could find that it was reasonably foreseeable that Juan would be so affected by the officer's actions. Summary judgment will be denied as to Count 4 of the complaint.

### *6. Civil Liability for Criminal Conduct*

The magistrate judge concluded that the plaintiffs' claims of civil liability for criminal conduct failed as a matter of law. The Court agrees. As explained by the magistrate judge, section 2307.60 of the Ohio Revised Code allows for civil recovery of damages for persons injured by a criminal act. Recovery depends on the existence of a criminal conviction. In this

instance, no criminal conviction arose from the incident. Therefore, summary judgment will be granted as to Counts 8 and 10 of the complaint.

**IV.**

For the reasons stated above, the defendants' motion for summary judgment is granted, in part, and denied, in part. Specifically, the motion is granted with respect to the claims that officers lacked reasonable suspicion to stop Juan; that Juan's detention was longer than reasonably necessary; that Officer Crisan failed to protect Juan from Officer Kazimer's initial use of force; that the defendants are liable for false arrest; that Officer Crisan is liable for negligence; that Officer Kazimer is liable to Ms. Peréz for battery; that the defendants are liable for intentional infliction of emotional distress; and that the defendants are civilly liable for criminal conduct. The motion is denied in all other respects.

IT IS SO ORDERED.

 /s/ Lesley Wells
UNITED STATES DISTRICT JUDGE

Date:  26 March 2015