IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUAN ORTIZ, *et al.*,<br><br>               Plaintiffs,<br><br>vs.<br><br>BRIAN KAZIMER, *et al.*,<br><br>              Defendants. | CASE NO.  1:11-cv-01521<br><br>Judge Patricia A. Gaughan<br><br>Magistrate Judge David A. Ruiz |

**PLAINTIFFS' TRIAL BRIEF**

## I.     Statement of facts

On August 16, 2010, Juan Ortiz was playing with his Walkman in the parking lot of the West Terrace Apartment complex where he lived with his parents, Ramón and Alma. Juan was wearing headphones and listening to music. At the time, Juan was 16-years old but looked much younger: he was under five-feet tall and weighed about 100 pounds. Juan and his family are American citizens from the U.S. territory of Puerto Rico. He has a dark complexion and Down syndrome, which is evident at first glance. Because of his disability, he does not speak or understand English.

While Juan was playing, Officers Brian Kazimer and Dan Crisan were searching for a robbery suspect in the area. The robbery victim, Timothy Krall, had described his assailant as a white male, 5'8", wearing a long shirt and a hat. The manager of the apartment complex, Nina Kennedy, had called 911 to report that two white males had come to her apartment to turn in a wallet they had found in the complex's parking lot. Ms. Kennedy described these men as white, one in his 40s, with dirty blond hair and a mustache, wearing a blue shirt, and the other in his 50s, wearing a ball cap, clean shaven, and possibly wearing a red shirt. While Kazimer and Crisan were patrolling the area, the dispatcher repeated three times this entire description of the two Good Samaritans, and at no time did the dispatcher suggest that these men were involved in the robbery.

Juan was wearing a red shirt while he played with his Walkman when Officer Kazimer jumped out of the zone car and began chasing Juan. While Kazimer chased Juan, Crisan reported on the radio that his partner was in pursuit of a "black male." Juan, who does not understand English and, in any event, had been listening to music on his headphones, ran to his parents.

The West Terrace Apartments include several buildings at the corner of Lorain Avenue and West 143rd Street in Cleveland. Juan ran from where he had been playing, down the sidewalk in front of the middle building of the complex and down a small hill to where Ramón and Alma had been visiting with Juan's brother, Malvin. Juan's parents were in the parking lot outside Malvin's building when Juan reached them. Juan had stopped running and was with his parents when Officer Kazimer caught up.

While Kazimer was chasing Juan, one of Juan's relatives, Eliezer Manzano, intervened to inform Kazimer that Juan had Down syndrome and did not understand

English. Kazimer, thus, had not only his visual perception of Juan's obvious disability, but also received specific and direct information about Juan's disability before Kazimer laid a hand on Juan. But rather than accepting this additional piece of information that differentiated Juan from the robbery suspect or even the Good Samaritans (none of whom were described as having any kind of developmental disability) Kazimer told Manzano to "Shut up and get out of [his] way." Manzano complied.

Even though Juan did not match the description of the robbery suspect or the two white males who turned in the wallet, and even though Manzano had intervened to inform Kazimer that Juan was a disabled child who could not understand what Kazimer was yelling at him, and even though Juan had stopped running and—in Kazimer's own words—"surrendered," Kazimer grabbed Juan from his parents and slammed him against a parked car. Kazimer held Juan pinned against the car while screaming racial slurs at his parents and relatives. Kazimer roughly handcuffed Juan and continued to detain him without cause. Witnesses have varying recollections as to how long Kazimer pinned Juan to the car and how long the officers kept Juan in handcuffs. Witness estimates range from five–fifteen minutes pinned against the car with an additional ten–thirty minutes of detention thereafter.

When Kazimer first tackled Juan, his father explained Juan's disability to Kazimer. Kazimer responded, "you're lucky we didn't shoot him." Juan's parents, and other bystanders, continued to tell Kazimer while he continued to brutalize Juan, including by pinning him against a parked vehicle and roughly jerking Juan's arms up behind his back to handcuff him.

In the meantime, Crisan drove the zone car around to where his partner had seized Juan. Crisan did nothing to assist Juan or prevent Kazimer from hurting Juan.

Like Kazimer, Crisan ignored the bystanders, including apartment manager Nina Kennedy, who called from a second-floor window that the police had the wrong person.

Juan surrendered before Kazimer laid a hand on Juan. Juan made no effort to resist. He just cried as the officer hurt him. As Ramón and Alma tried to comfort their terrified son, Kazimer pushed Alma to the ground. At the time, Alma was 63 years old. She is even smaller than Juan. Throughout this interaction, the officers screamed racist and bigoted slurs at the Ortiz family

Juan experienced severe emotional and physical distress in the wake of this ordeal including sleeplessness, intestinal problems, and anxiety. He has been diagnosed with post-traumatic stress disorder. He remains terrified of uniformed officers as well as sirens. The Ortiz family moved from the West Terrace Apartments to help Juan try to overcome the attack.

## II.    Discussion of controlling law

### A.    Defendant Kazimer unreasonably seized Juan without reasonable suspicion that he had committed any crime.[1]

Law-enforcement officials must be "aware of specific and articulable facts which g[i]ve rise to reasonable suspicion" to have grounds to initiate a *Terry* stop.[2] If the stop was proper, the "degree of intrusion" must be "reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials'

---

[1] Although this claim was dismissed on summary judgement, if the evidence warrants, plaintiffs will request a Fed. R. Civ. Pr. 15 amendment to conform the pleadings to the evidence.

[2] *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

conduct given their suspicions and the surrounding circumstances.[3] To detain a citizen, officers must "have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[4]

Where a *Terry* detainee's "physical appearance differ[s] significantly from that of the suspect," the stop is improper.[5] For example, in *U.S. v. Jackson*, officers looking for a bald black man driving a green car lacked a reasonable basis to stop a black man with hair driving a green car.[6] The court held that "[n]o reasonable person would mistake [Jackson] for someone who was bald."[7] Likewise in *U.S. v. Galaviz*, the Sixth Circuit held that, when searching for a black suspect, the police lacked reasonable suspicion to detain a Hispanic man.[8]

No reasonable person would believe that turning in a wallet was "criminal activity," so the notion that Juan matched some aspect of the Good Samaritan's description does not provide reasonable suspicion. And in any event, no reasonable person would mistake Juan for an adult white male, let alone someone in his 50s. In investigating the robbery in question, the officers lacked justification to stop anyone who was not white or an adult. The officers perceived Juan to be black, and admit he appeared to be a child. There is no suggestion that the officers had reason to search for a black child with Down syndrome. Thus, they had no reason to even be interested in

---

[3] *U.S. v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *U.S. v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)).

[4] *U.S. v. Cortez*, 499 U.S. 411, 417–18 (1981).

[5] *U.S. v. Jackson*, 188 Fed. Appx. 403, 410 (6th Cir. July 20, 2006).

[6] *Id.* at 409.

[7] *Id.*

[8] 645 F.3d 347, 353 (6th Cir. 2011).

Juan in the first place. Just like driving a green car was not sufficient to create reasonable suspicion in *Jackson*, wearing a red shirt does not cut it here.[9]

And the degree of the intrusion vastly exceeded the scope of the situation. To evaluate the detention, it must be sufficiently limited in time, the investigative means used must be the least intrusive means available.[10] But the detention here "exceeded the purpose and object of the stop."[11] Slamming a child (who the officer knew had developmental and language difficulties) against a parked car, roughly handcuffing him, and keeping him detained away from his parents who simply wanted to comfort their terrified boy was wildly disproportionate to the purpose and object of the stop (finding the gentleman in his 50s who turned in the wallet). There are a plethora of ways Defendant Kazimer could have approached the stop: brute force was not the least intrusive means available.

**B.      Defendant Kazimer unreasonably used force on a suspect who had surrendered.**

Excessive-force claims are evaluated for "objective reasonableness."[12] "[P]roper application [of this test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers and others, and whether he is actively resisting

---

[9] *Jackson*, 188 Fed. Appx. at 410.

[10] *Davis*, 430 F.3d at 254.

[11] *U.S. v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996).

[12] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

arrest or attempting to evade arrest through flight."[13] "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of seizure.'"[14]

Defendant Kazimer admits that Juan surrendered before Kazimer touched him.[15] This candid admission removed any justification for the use of force against Juan. In *Baker v. City of Hamilton*, the Sixth Circuit condemned the use of force after a suspect has surrendered.[16] In *Baker*, the defendant officer arrested the two plaintiffs (Baker and Snader) in separate, unrelated incidents. The officer attempted to initiate a *Terry* stop of Baker after seeing him talk to a drug dealer on the street. The officer pulled alongside Baker and asked him to stop, but Baker kept walking. When the officer opened his car door, Baker ran and hid in the bushes. Baker surrendered by coming out of the bushes with his hands over his head. The officer struck Baker in the side of the head with a baton, saying "[t]hat's for running from me."

The other plaintiff, Snader, was walking with some other teenagers in an area where several cars had been burglarized. Officers stopped the group and put two of the teens in the back of a cruiser. Snader took off. When the officer said, "stop or I'll shoot," Snader slowed down. The officer reached him and hit Snader with a baton, tackled him, and sat on his back.

The officer maintained that his use of force was reasonable in each case. But "[c]ases in this circuit clearly establish the right of people who pose no safety risk to the

---

[13] *Id.* at 396.

[14] *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

[15] Kazimer Depo. (Sept. 20, 2012) 33:2–3, 48:3–7.

[16] 471 F.3d 601, 603–07 (6th Cir. 2006).

police to be free from gratuitous violence during arrest."[17] The court, which has "held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law," found that a jury could conclude that the force was "unjustified and excessive" because the officer struck them after they surrendered or while they were surrendering.[18]

Given Kazimer's admission that Juan had "surrendered" before Kazimer employed any force, the totality of the circumstances does not justify the type of seizure Kazimer elected to conduct including the application of sustained force.

### C.      Defendant Crisan failed to come to Juan's aid.

The Sixth Circuit first recognized § 1983 liability for failure to intervene in *Bruner v. Dunaway*.[19] To hold a police officer liable for failing to prevent the use of excessive force, a plaintiff must show that "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."[20] The evidence will support this claim.

---

[17] *Id.* at 608 (internal citation omitted).

[18] *Id.* at 607.

[19] 684 F.2d 422, 426 (6th Cir. 1982).

[20] *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 639-40 (6th Cir. 2013) (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (2008)).

### D.    Kazimer's battery of Juan.

A defendant is liable for the tort of battery when the plaintiff proves that the defendant "intends to cause a harmful or offensive contact, and in fact causes a harmful or offensive contact which damages the plaintiff."[21] A defendant does not need to intend harm, but must intend the contact. The evidence will support this claim.

### E.    Kazimer's negligent infliction of emotional distress

To succeed on this claim, Plaintiff must prove that he was aware of a real physical danger to himself and suffered emotional distress as a result.[22] The evidence will support this claim.

### F.    Defendant Kazimer is liable for his negligence for breaching a variety of duties to Juan.

A defendant is liable for negligence where he fails to discharge a duty owed to another, who is injured as a result."[23] "[T]he amount of care required to discharge a duty owed to a child of tender years is necessarily greater than that required to discharge a duty owed to an adult under the same circumstances."[24] Kazimer breached a plethora of duties to Juan: trying to stop a person who bore no resemblance to anyone suspected of a crime, ignoring Manzano as he communicated Juan's disability and language limitations, using force after Juan "surrendered," ignoring Nina Kennedy's warning that Juan was not the suspect, ignoring Juan's assembled relatives as they tried to assist him and explain his condition, and, indeed, by shouting bigoted expletives at the people

---

[21] *Howell v. Wittman*, 2008-Ohio-2429, ¶ 9 (2008)

[22] *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78 (1983).

[23] *Di Gildo v. Caponi*, 18 Ohio St. 2d 125, 127 (1969).

[24] *Id.*

trying to help Juan. Violently handcuffing Juan and detaining him at all also breached Kazimer's Fourth Amendment duties to Juan.

### G.  Defendants acted maliciously and sadistically are not entitled to statutory immunity.

Ohio Rev. Code § 2744 provides no shelter to these officers because the evidence will show that their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Kazimer used wildly excessive force on a disabled child who had surrendered and was making no effort to resist. Kazimer ignored various witnesses who informed him of Juan's disability and language limitations. Both officers screamed obscenities and used vulgar language with the Ortiz family: telling his mother to "get the hell back to where she belongs," using the term "Mexican wetback" as well as the "f-word" and telling the Ortizes "to go back to their own country if they can't speak the language here." The officers also told the family to "shut the fuck up," "get the fuck away from here," and "if he doesn't speak our language, why is he here, he should go back to where he came from." And Defendant Kazimer pushed Juan's mother, a slight woman who appears to be in her mid-70s, to the ground.

As the statutory immunity relates to Plaintiff's negligence claim, there is no requirement that the failure to discharge the duty owed be accidental as opposed to intentional. A malicious and intentional failure to discharge a duty owed can sustain a negligence claim.

### H.  Any reasonable officer would have known that violently attacking a disabled child without reasonable suspicion or probable cause violated the Constitution.

State actors are not entitled to qualified immunity where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is

doing violates that right."[25] "*Terry*, which requires reasonable suspicion for investigative detentions, has been clearly established since 1968."[26] Where, as here, the officers had no reason to believe that the man in the red shirt had engaged in criminal conduct and where the target did not match the race or age of the man in the red shirt, no reasonable official would have believed there was reasonable suspicion to stop Juan.

And it has been clearly established for many years in this circuit that citizens have the right to be free from use of gratuitous violence during interactions with police.[27] A suspect who, by the officer's own admission, has surrendered, cannot be struck without transgressing the Fourth Amendment.

## III. Witness list (with brief description of the subject matter of each)

    A.    Ramón Ortiz will testify about what he observed the defendants do and say to his family and related matters

    B.    Alma Perez will testify about what she observed the defendants do and say to her family and related matters

    C.    Lissette Hernandez will testify about what she observed the defendants do and say to the Ortiz family and related matters

    D.    Malvin Perez will testify about what he observed the defendants do and say to the Ortiz family and related matters

    E.    Hector Perez will testify about what he observed the defendants do and say to the Ortiz family and related matters

    F.    Daniel Ortiz will testify about what he observed the defendants do and say to the Ortiz family and related matters

    G.    Yahaira Acevedo will testify about what she observed the defendants do and say to the Ortiz family and related matters

---

[25] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992); *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993).

[26] *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003).

[27] *Baker*, 471 F.3d at 608.

H.   Nina Kennedy will testify about her 911 call to report that a wallet was turned in and what she observed the defendants do and say to the Ortiz family and related matters

I.   Jean Posey will testify about what she observed the defendants do and say to the Ortiz family and related matters

J.   Eliezer Manzano will testify about what he observed the defendants do and say to the Ortiz family and related matters

K.   Joseph A. Stoker, D.O. will testify about the treatment Juan received the evening of the attack

L.   John W. DiFiore, MD will testify about the surgery to treat the suprapubic abscess Juan suffered as a result of the attack

M.   Richard Melendez, CPST will testify about the impact of the attack on Juan

N.   Defendants Brian Kazimer and Dan Crisan will be questioned about their actions and statements vis-à-vis the Ortiz family, and how they escaped any discipline or consequence

O.   Police Chief Calvin Williams will testify about the training and discipline defendants received

P.   Safety Director Michael McGrath will testify about the training and discipline defendants received including during his time as police chief

Q.   Martin L. Flask will testify about the training and discipline defendants received including during his time as safety director

R.   Chairman Thomas F. Jones will testify about the Civilian Police Review Board's recommendation that Kazimer and Crisan be disciplined for how they treated Juan and his family

S.   Dr. Peter J. Geier will provide expert testimony on the emotional impact of the attack on Juan

T.   Plaintiffs reserve the right to call any defense witness

**IV.    Index of exhibits (with brief description of each and discussion of evidentiary issue likely to arise at trial)**

| # | Exhibit title | Description | Bates # |
|---|---|---|---|
| 1 | ODRC Offender detail Richard Smiley, Jr. | Contains a photograph and physical description of Richard Smiley, Jr. (actual robbery perpetrator) | ORTIZ000001 |
| 2 | ODRC offender detail Jordan Temple | Contains a photograph and physical description of Jordan Temple (actual robbery perpetrator) | ORTIZ000002 |
| 3 | Photographs | Photographs of Juan Ortiz on the date of his surgery | ORTIZ000003–4 |
| 4 | Letter to Ramon Ortiz from Thomas F. Jones (11/9/2010) and accompanying envelope | Letter from the Chairman of the Cleveland Police Review Board notifying Ramon Ortiz that his OPS Complaint #10-339 against Officers Kazimer and Crisan was sustained and a letter recommending discipline would be forwarded to the chief of police | ORTIZ000005–6 |
| 5 | OPS Complaint #10-339 | Contents of OPS file regarding the Ortiz family's complaint | ORTIZ000007–20, 30–47 |
| 6 | Duty Report (8/16/2010) | Duty report for Zone Car 111 (8/16/2010) | ORTIZ000021 |
| 7 | Daily Duty Assignments (8/16/2010) | Cleveland Division of Police First District Platoon B list of assignments (8/16/2010) | ORTIZ000022 |
| 8 | Field Report (8/16/2010) | Police report on aggravated robbery of Tony Krall by Richard Smiley and Jordan Temple (8/16/2010) | ORTIZ000023–29 |
| 9 | Brian Kazimer Human Resources personnel file | Personnel file received via public-records request | ORTIZ000048–72 |
| 10 | Brian Kazimer Public Safety personnel file | Personnel file received via public-records request | ORTIZ000073–158 |

| 11 | Dan Crisan Human Resources personnel file | Personnel file received via public-records request | ORTIZ000159–214 |
| 12 | Dan Crisan Public Safety personnel file | Personnel file received via public-records request | ORTIZ000215–362 |
| 13 | General Order 2.1.01 (as revised May 7, 2007) | Division of Police General Order on the use of force including non-deadly force and filing of reports regarding same | ORTIZ000363–379 |
| 14 | OPS Chairman Thomas F. Jones Charge Letter to Chief of Police (11/9/2010) | Letter recommending Kazimer and Crisan receive written reprimands and letters of reinstruction regarding their handling of Juan Ortiz on 8/16/2010 | ORTIZ000380–381 |
| 15 | Murtis Taylor record (7/26/2011) | Social-worker records regarding treatment of Juan Ortiz following attack on 8/16/2010 | ORTIZ000382 |
| 16 | Medical records | Records of treatment of Juan at Fairview Hospital | ORTIZ000383–451 |
| 17 | Medical records | Records of treatment of Juan Ortiz at MetroHealth System | ORTIZ000452–500 |
| 18 | Expert report Peter J. Geier | Report dated October 5, 2011 | ORTIZ000501-506 |
| 19 | Medical records | Centro San Cristobal Villalba | ORTIZ000507-508 |
| 20 | Medical records | LabCorp Raritan, Raritan, NJ | ORTIZ000509-511 |
| 21 | Medical records | | ORTIZ000512-517 |
| 22 | Pictures | Juan Ortiz at Fairview Hospital Emergency Room | ORTIZ000518-522 |
| 23 | Medical records | Jose Gomez-Rivera, MD | ORTIZ000534-537 |
| 24 | DOJ Investigation of Cleveland Division of Police | Department of Justice Report | ORTIZ000538-596 |
| 25 | Public-records | Public records provided by the City of Cleveland regarding the defendant officers and the investigation of what happened to Juan | ORTIZ000-597-4972 |

| 26 | Photographs | Photographs of Juan attached to Ramón Ortiz's declaration filed in support of the motion for summary judgment (12/17/2012) | |
| 27 | Chapter 25 – CCO§ 115-4 | General Order governing police conduct | |
| 28 | DS240145 | OPS recording of interview with the Ortiz family 8/17/2010 (36:06) | |
| 29 | Dist 1, 8-16-10 | Radio/dispatch calls 8/16/2010 (2:21:55) | |
| 30 | 08-16-10 17-37-28 Tel 15 Ext-3233 (3233) | 911 call from Rufus Smiley, Jr. 8/16/2010 (2:09) | |
| 31 | 08-16-10 16-57-08 Tel 15 Ext-3233 (3233) | 911 call from Tony Krall 8/16/2010 (2:45) | |
| 32 | 08-16-10 17-27-26 Tel 07 Ext-3225 (3225) | 911 call from Nina Kennedy (4:32) | |
| 33 | Declarations | Witness declarations submitted with summary-judgment response | |
| 34 | Subpoena response | All records provided in response to Plaintiff's trial subpoena to the City of Cleveland records custodian. | ORTIZ000-597-4972[28] |
| 35 | Picture | Close-up color map of West Terrace Apartments | |
| 36 | Picture | Google map view of West Terrace Apartments | |
| 37 | Picture | Wide color map of West Terrace Apartments | |

Plaintiff reserves the right to use or introduce all documents used or provided by the defense.

---

[28] Plaintiff anticipates that the content of the custodian's trial production consists of the records previously provided with these Bates numbers. But Plaintiff reserves the right to use or seek to introduce all records the City provides.

**V.      Discussion of evidentiary issues likely to arise at trial**

Plaintiff has served a trial subpoena on the City of Cleveland records custodian requesting that records be provided two weeks before trial. Plaintiff may need the Court's assistance to facilitate this production for the sake of efficiency at trial.

Plaintiff has just learned that defendants intend to use/introduce certain records regarding the location of their zone car on the date in question. Plaintiff was never provided with these records (either in response to party discovery, Rule 45 subpoenas to the City, and numerous public-records requests). Plaintiff reserves the right to object to the use or introduction of this new evidence at trial once counsel has had the opportunity to review.

**VI.     Estimated trial length**

Plaintiffs estimate that the trial will take up to two weeks.

Respectfully submitted,

| | |
|---|---|
| */s/ Ashlie Case Sletvold* | *[Per consent]* |
| Subodh Chandra (0069233) | Anthony D. Jordan (0066150) |
| Donald Screen (00440770) | Lakeside Place, Suite 420 |
| Ashlie Case Sletvold (0079477) | 323 Lakeside Avenue West |
| The Chandra Law Firm LLC | Cleveland, Ohio 44113 |
| 1265 W. 6th St., Suite 400 | 216.773.1536 Phone |
| Cleveland, OH 44113-1326 | 216.575.7664 Fax |
| 216.578.1700 Phone | adj2065@msn.com |
| 216.578.1800 Fax | |
| Subodh.Chandra@ChandraLaw.com | |
| Donald.Screen@ChandraLaw.com | *Attorneys for Plaintiffs* |
| Ashlie.Sletvold@ChandraLaw.com | |

**CERTIFICATE OF SERVICE**

I certify that my office filed the document above using the Court's online-filing system, which will send a copy to all counsel of record.

*/s/Ashlie Case Sletvold*
*One of the Attorneys for Plaintiffs*